# EXHIBIT A

Law Division Motion Section Initial Case Management Dates for CALENDARS, B, D, E, F, H, L, M, N, P, R, T, W, X, Z will be heard in person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 5/15/2025 9:30 AM

Civil Action Cover Sheet - Case Initiation (12/01/24) CCL 0520

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Neurodegenerative Disease Research, Inc.

v.

Northwestern University

No. 2025L003685

FILED
3/14/2025 2:52 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L003685
Calendar, Q
31831849

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ■ Yes ❑ No

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

(FILE STAMP)

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ❑ 027 Motor Vehicle
- ❑ 040 Medical Malpractice
- ❑ 047 Asbestos
- ❑ 048 Dram Shop
- ❑ 049 Product Liability
- ❑ 051 Construction Injuries
  (including Structural Work Act, Road
  Construction Injuries Act and negligence)
- ❑ 052 Railroad/FELA
- ❑ 053 Pediatric Lead Exposure
- ❑ 061 Other Personal Injury/Wrongful Death
- ❑ 063 Intentional Tort
- ❑ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ❑ 065 Premises Liability
- ❑ 078 Fen-phen/Redux Litigation
- ❑ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ❑ 007 Confessions of Judgment
- ❑ 008 Replevin
- ❑ 009 Tax
- ❑ 015 Condemnation
- ❑ 017 Detinue
- ❑ 029 Unemployment Compensation
- ❑ 031 Foreign Transcript
- ❑ 036 Administrative Review Action
- ❑ 085 Petition to Register Foreign Judgment
- ❑ 099 All Other Extraordinary Remedies

### COMMERCIAL LITIGATION
CASE TYPES:
- ■ 002 Breach of Contract
- ❑ 070 Professional Malpractice
  (other than legal or medical)
- ❑ 071 Fraud (other than legal or medical)
- ❑ 072 Consumer Fraud
- ❑ 073 Breach of Warranty
- ❑ 074 Statutory Action
  (Please specify below.**)
- ❑ 075 Other Commercial Litigation
  (Please specify below.**)
- ❑ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ❑ 062 Property Damage
- ❑ 066 Legal Malpractice
- ❑ 077 Libel/Slander
- ❑ 079 Petition for Qualified Orders
- ❑ 084 Petition to Issue Subpoena
- ❑ 100 Petition for Discovery

** _____

Primary Email: lawcenter.reese@gmail.com

Secondary Email: _____

Tertiary Email: _____

By: Reese Law Center, LLC #58496
(Attorney)                    (Pro Se)

**Pro Se Only:** ❑ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois
Page 1 of 1

FILED
3/14/2025 2:52 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L003685
Calendar, Q

IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| Neurodegenerative Disease Research, Inc. § <br> Plaintiff, § <br> § <br> Vs. § <br> § <br> Northwestern University, § <br> Defendant. § | Case No. 2025L003685 _____ |

## COMPLAINT

Plaintiff, Neurodegenerative Disease Research, Inc (NDR), by undersigned counsel, sues defendant Northwestern University (Northwestern), and alleges:

### Nature of the Case

1. Plaintiff, Neurodegenerative Disease Research, Inc. (hereinafter "NDR"), is a nonprofit organization dedicated to advancing research focused on understanding the causes of Amyotrophic Lateral Sclerosis (ALS).

2. Defendant, Northwestern University (hereinafter "Northwestern"), is a private university located in Illinois, recognized as a leading institution in ALS research.

3. NDR entered into a gift agreement with Northwestern to fund ALS research under the direction of Dr. Teepu Siddique, a renowned expert in the field.

4. NDR alleges that Northwestern breached the terms of the gift agreement, by fraudulently concealing material information, negligently misrepresenting facts through nondisclosure and failing to provide an equitable accounting. These actions have resulted in significant damages to NDR and its mission.

1

## Parties

5. Plaintiff, Neurodegenerative Disease Research, Inc. (NDR), is an IRS 501(c)(3) nonprofit organization incorporated and headquartered in Florida.

6. Defendant Northwestern University is a private university with its headquarters in Cook County, Illinois. It includes twelve schools and colleges, including the Feinberg School of Medicine.

## Jurisdiction and Venue

7. The Court has jurisdiction over this dispute pursuant to 735 ILCS 5/2-209 of the Illinois Code of Civil Procedure because the making and performance of the agreement at issue is substantially connected to this State.

8. Venue pursuant to 735 ILCS 5/2-101 because a substantial part of the events giving rise to this Complaint occurred in this jurisdiction.

## General Allegations

9. Amyotrophic Lateral Sclerosis, commonly referred to as ALS or Lou Gehrig's Disease (and hereinafter ALS), is a rare progressive disease that causes deterioration of nerve cells in the brain and spinal cord. The disorder affects motor neurons which control voluntary muscle movement including talking, walking, chewing and breathing. No cure or effective treatment has yet been discovered. The average lifespan following the onset of symptoms is typically 3 to 5 years.

10. Siobhan Ellison, the president of plaintiff Neurodegenerative Disease Research, Inc. (NDR), has extensive experience in research involving the discovery of causes of rare diseases in horses and the development of pharmaceutical treatments for those diseases.

She holds a Doctor of Veterinary Medicine (DVM) degree as well as a PhD in molecular biology from the University of Florida. She has developed and patented pharmaceuticals that are currently in use in veterinary medicine.

11. In 2019 a friend of Ellison's was diagnosed with ALS. The friend, who had substantial resources and was aware of her professional background, suggested to Ellison his interest in the formation of a nonprofit corporation to be endowed by him and to be directed by Ellison that would engage in ALS research. The result was the formation of NDR on March 2, 2020.

12. Through her research Ellison became aware of work being done on ALS at Northwestern's Feinberg School of Medicine and, in particular, areas of study being undertaken on ALS by Dr. Teepu Siddique at that school. Ellison further learned of Siddique's reputation as a leader in the field of ALS research. Ellison was already aware of Northwestern's reputation as a prominent educational and research institution.

13. Siddique was hired by Northwestern, pursuant to a written contract, with his tenure beginning on January 1, 1991, as an associate professor of neurology and as director of research of the Feinberg School's Neurology Department. He held those positions until approximately January of 2023.

14. Ellison first contacted Siddique in December of 2020 and began discussion of possible avenues of collaboration between NDR and Northwestern on ALS research including causation and the testing of possible means of treatment being investigated by NDR.

3

15. During ongoing discussions Siddique suggested a gift to Northwestern from NDR to be particularly designated for the ALS research Siddique's laboratory was conducting.

16. NDR indicated to Siddique its willingness to consider such a gift.

17. At all times pertinent to this action Northwestern had a policy requiring gifts to the university to be made pursuant to a gift agreement including certain standard provisions and otherwise subject to the approval of a person or persons the name(s) and title(s) of whom are unknown to NDR.

18. Andrew Christopherson, Assistant Dean for Development at Northwestern's Feinberg School of Medicine, acted as a liaison between Siddique and NDR on the one hand and those in the university structure, including its legal department, whose approval was required.

19. On or about April 6, 2021, NDR and Northwestern entered into a gift agreement. Pursuant to this agreement:

    a.  NDR was to contribute $1.61 million in installments over approximately two years;

    b.  The contribution was to be "used to establish an expandable fund to be known as the Neurodegenerative Disease Research/Siddique Lab ALS Discovery Fund;"

    c.  "The Fund shall be used to research on amyotrophic lateral sclerosis (ALS) at the laboratory of Dr. Teepu Siddique, or its successor;"

4

    d.    "Under current practices, Feinberg shall prepare an annual report about the use of the Fund for the Donor, until the Gifts are fully expended." (*See*, Exhibit A)

20. The discussions between Siddique and NDR also included the possibility of an additional contribution by NDR for what they informally referred to as the Big Project. This was proposed by Siddique as a multifaceted plan to integrate various aspects of study on ALS. He projected that the project would cost about $12.5 million over five years.

21. On July 12, 2021, NDR entered into a second gift agreement with Northwestern. The provisions of the agreement included:

    a.    NDR would contribute $12.5 million in ten installments of $1.25 million each over about four and a half years beginning on July 31, 2021;

    b.    The contributions were to be "added to the Neurodegenerative Disease Research/Siddique Lab ALS Discovery Fund;"

    c.    "The Fund shall be used to study amyotrophic lateral sclerosis (ALS) in the laboratory of Dr. Teepu Siddique and under his direction;"

    d.    "Under current practices, Feinberg shall prepare an annual report about the use of the Fund for the Donor, until the Gifts are fully expended." (*See*, Exhibit B)

22. The two signatories for Northwestern on the second gift agreement included Eric G. Neilson, MD, Northwestern's Vice President for Medical Affairs and Dean of the Feinberg School of Medicine.

23. Prior to the execution of the second gift agreement Northwestern had proposed an agreement that was the same as the one executed except that the second paragraph ended with the sentence: "The Fund shall be used to study amyotrophic lateral sclerosis (ALS) in the laboratory of Dr. Teepu Siddique, or its successor."

24. NDR required removal of the words "or its successor" and their replacement with "and under his direction" in order to sign, and the agreement signed by the parties included that change.

25. NDR made payments to Northwestern totaling $3.36 million under the gift agreements.

26. At the time the gift agreements were entered into by the parties and at the time NDR made the aforesaid payments to Northwestern, NDR was unaware that Siddique and Northwestern were then engaged in litigation concerning matters potentially affecting Siddique's continued tenure or his ability to engage in ALS research effectively at Northwestern.

27. On July 2, 2019, Siddique had filed a complaint against Northwestern and affiliates as well as the aforesaid Dean Eric G. Nielson (¶17) and others, in the Circuit Court of Cook County, Illinois. A copy of the complaint is attached hereto as Exhibit A.

6

28. The causes of action asserted included breaches of contract by Northwestern and its Feinberg School as well as interference with Siddique's employment contract by Neilson.

29. Factual allegations in the complaint included that Dimitri Krainc, Chair of Feinberg's Department of Neurology, "has deliberately and maliciously undermined Plaintiffs reputation by denigrating his accomplishments to others in the NU community, announcing at the state of the department faculty and staff meeting in 2016 that Plaintiff had been put 'out to pasture,' in the presence of Defendant [Dean Eric G.] Neilson and the head of NMHC Dean M. Harrison. He followed this up with an email to the <u>entire</u> NU Feinberg neurology faculty that he was actively looking to fill Plaintiff's position. Plaintiff only learned of this search from the email. In 2016, Krainc, without Plaintiff's advance knowledge, advertised for an academic neurologist to become Director of a new Les Turner ALS Research and Patient Center, effectively seeking to eliminate Plaintiff's position, responsibility, and authority." *Id.* ¶32 (emphasis in Siddique's complaint).

30. Siddique's complaint alleged further actions taken by Neurology Department officials to undermine his authority and limit his ability to engage in research. He concluded these allegations by stating, "The cumulative effect of the foregoing . . . has been to intentionally, deliberately, and maliciously ***attempt to dismantle, cripple, and***

7

*ultimately render ineffective, Plaintiff's research* and clinical work *in order to force him out of his position* by setting him up for failure, all in breach of his Contract." *Id.* ¶38 (emphasis supplied).

31. Siddique, Neilson, attorneys in Northwestern's legal department and other agents of Northwestern knew of the existence of the lawsuit and the allegations made therein prior to the time that NDR first contacted Siddique about possible collaboration, but no one from Northwestern informed NDR about it and NDR did not learn of it until near the end of 2022 when Siddique revealed to NDR that he was going to be leaving Northwestern.

32. Siddique and Northwestern entered into a settlement agreement of Siddique's lawsuit on or about February 17, 2022. The case was dismissed by stipulation on February 22, 2022. Siddique has declined to provide NDR with a copy of the settlement agreement, asserting that it includes a nondisclosure provision.

33. Siddique's position at Northwestern terminated as of February 1, 2023. Siddique has sought but not obtained another position since the termination. NDR believes and alleges that this termination was a part of the settlement agreement.

34. Following Dr. Siddique's departure, Northwestern failed to negotiate in good faith to continue ALS research according to the terms of the gift agreement and NDR's intent.

8

35. Despite NDR's efforts to propose alternative arrangements to honor its intent, Northwestern did not engage in meaningful discussions or attempts to preserve the collaboration.

36. After failing to reach alternatives, NDR submitted a formal demand for rescission to Northwestern, which was also rejected.

37. As a result, Northwestern misappropriated NDR funds for its own ALS-related purposes rather than adhering to the specific conditions outlined in the gift agreement.

38. Northwestern, as the administrator of the gift agreement, had a special relationship and corresponding fiduciary duty to NDR as the donor.

39. Northwestern usurped NDR's donor intent by using ALS funds for their own research and failed to disclose the turmoil and dysfunction in the lab.

40. Northwestern had a duty;
    a) To use the funds strictly for ALS research as pledged;
    b) To keep NDR informed about the research progress and how the funds are being utilized; and
    c) To ensure that any changes in the research direction or personnel involved are communicated and agreed upon by NDR.

### Count 1 - Fraudulent Concealment

41.     NDR realleges paragraphs 1 through 40 as if fully set forth herein.

9

42. NDR relied on the reputations of Northwestern and Siddique and their expertise in ALS research and trusted them in negotiating with them and in entering into the gift agreements.

43. Northwestern, as the potential donee, had a special or fiduciary duty to NDR as the potential charitable donor, to disclose to NDR during the negotiations all pertinent circumstances within its knowledge that could adversely affect NDR's willingness to make the gifts, including the then ongoing litigation between Northwestern and Siddique.

44. Northwestern's concealment of the ongoing litigation was done fraudulently with the intent to avoid discouragement of the potential gifts and to induce a false belief by NDR that Siddique's position at Northwestern was secure, ***that the lab was working productively*** and that its gifts would be used under the direction of Siddique as it had contemplated.

45. NDR could not have learned of the existence of the ongoing litigation through reasonable inquiry.

46. NDR relied on Northwestern's silence as an indication of the lack of existence of such litigation, or of the problems alleged in the pleadings therein.

47. NDR would not have entered into the gift agreements nor made the contributions if it had previously known of the problems revealed by the litigation.

48. NDR has been damaged in the amount of contributions made and the loss of use of those funds.

**WHEREFORE** NDR prays for judgment against Northwestern for rescission of the gift agreements and restoration of the status quo ante, compensatory and punitive damages, and its costs.

### Count 2 - Negligent Misrepresentation

49. NDR realleges paragraphs 1 through 40 as if fully set forth herein.

50. Northwestern negligently misrepresented the status of Siddique's involvement in the ALS research in that it negligently omitted material facts by concealing the potential departure of Siddique and the problems alleged in his lawsuit, during the negotiation of the gift agreement, despite knowing of its importance to NDR and the objectives of the donor's intent.

51. As a result, Plaintiff has suffered damages.

**WHEREFORE** NDR prays for judgment against Northwestern for rescission of the gift agreements and restoration of the status quo ante, compensatory damages, and its costs.

### Count 3 - Equitable Accounting

52. NDR realleges paragraphs 1 through 40, as if fully set forth herein.

53. Northwestern has failed to provide the annual reports to NDR required as alleged in paragraphs 14.d. and 16.d.

54. The only report provided to NDR was one received in September of 2024 that merely stated a balance of $500,000 in the Neurodegenerative

11

Disease/ALS Novel Therapy account and $1,826,740 in the Big ALS Project account. No report has provided any information about "the use of the Fund," particularly how amounts donated by ALS but no longer in the funds as stated in the foregoing report were actually used.

55. A determination of how the contributions were used will require accounting of a complex nature.

56. NDR does not have an adequate remedy at law.

**WHEREFORE** NDR prays for judgment against Northwestern for an equitable accounting and such further relief as the Court deems to be just and proper.

### Count 4- Breach of Contract

57. Plaintiff realleges and incorporates paragraphs 1-40 above as if fully set forth herein.

58. The gift agreement is a valid contract.

59. NDR has performed all obligations under the agreement and taken reasonable steps to resolve the dispute.

60. Northwestern breached the agreement by failing to manage the funds in accordance with NDR's intent and rejecting NDR's proposals resulting in damages, including lost opportunities for ALS clinical trials research and harm to NDR's reputation.

**WHEREFORE** NDR prays for judgment against Northwestern for rescission of the gift agreements and restoration of the status quo ante, compensatory and punitive damages, and its costs.

## Jury Demand

Plaintiff demands a trial by jury on all issues so triable.

Dated: 03/14/2025

Respectfully submitted,

Attorney Derrick B. Reese, J.D.; LLM
Attorney for Plaintiff

Reese Law Center, LLC
734 Ridge Rd
Homewood, IL 60430
(O) 708-914-4570
(F) 708746-4435
E: lawcenter.reese@gmail.com
Atty #58496

FILED DATE: 3/14/2025 2:52 PM   2025L003685

## A GIFT AGEEMENT BETWEEN
## NEURODEGENERATIVE DISEASE RESEARCH INC.
## AND NORTHWESTERN UNIVERSITY

Northwestern University ("Northwestern") gratefully acknowledges the generosity of Neurodegenerative Disease Research Inc. (the "Donor") in executing this gift agreement to support Northwestern.

1. **Gift and Schedule.** The Donor intends to give $1,610,000 in cash (the "Gift") to Northwestern according to the following schedule.

    | Gift Amount: | By No Later Than: |
    |---|---|
    | $110,000 | April 30, 2021   4/6/21 |
    | $250,000 | June 30, 2021   4/7/21 |
    | $250,000 | December 31, 2021 |
    | $250,000 | March 31, 2022 |
    | $250,000 | June 30, 2022 |
    | $250,000 | March 31, 2023 |
    | $250,000 | June 30, 2023 |

2. **Designation of the Gift.** The Gift shall be used to establish an expendable fund to be known as the Neurodegenerative Disease Research/Siddique Lab ALS Discovery Fund (the "Fund"). The Fund shall be administered by Northwestern's Feinberg School of Medicine ("Feinberg"), at the discretion of the Les Turner Foundation/Herbert C. Wenske Foundation Professor, which position is currently held by Dr. Teepu Siddique. The Fund shall be administered in accordance with applicable Northwestern policies and practices, including those on investment, spending, and administration, which may change from time to time. The Fund shall be used to research on amyotrophic lateral sclerosis (ALS) at the laboratory of Dr. Teepu Siddque, or its successor.

3. **Stewardship.** Stewardship shall be in accordance with standard practices, as they may change from time to time. Under current practices, Feinberg shall prepare an annual report about the use of the Fund for the Donor, until the Gift is fully expended.

4. **Campaign Credit and Recognition.** The Donor shall be provided credit for the Gifts in We Will. The Campaign for Northwestern (the "Campaign"), as well as for any other gifts or pledges made by the Donor during the Campaign. The Donor may be acknowledged in applicable Northwestern recognition societies and honor rolls, which may be in print or digital format.





5. **Planning for the Future.** If changed circumstances make it impossible, impractical, or inadvisable for Northwestern to implement the purpose of the Funds as originally envisioned, Northwestern may modify the purpose with an aim to continue to honor the Donor's intentions as closely as possible. In such circumstances, Northwestern will make reasonable efforts to consult with the Donor. Any changes or modifications due to changed circumstances agreed to by the Donor will be attached to this gift agreement. If the changes or modifications are not agreeable to the Donor, Northwestern will be notified in writing and future pledge payments will cease. (As required by IRS regulations for charitable gifts, Northwestern will retain any already-received gifts.)

This gift agreement is dated this 6 day of March, 2021.

**NEURODEGENERATIVE DISEASE RESEARCH INC.**

By: *Siobhan Ellison DVM PhD*
_____
Siobhan Ellison, DVM, PhD
President

**NORTHWESTERN UNIVERSITY**

By: _____
Robert E. McQuinn
Vice President
Alumni Relations and Development

2

DocuSign Envelope ID: F9CB6564-6E83-4E29-AD9D-89A25154B5A8

FILED DATE: 3/14/2025 2:52 PM   2025L003685

# A GIFT AGREEMENT BETWEEN
# NEURODEGENERATIVE DISEASE RESEARCH INC.
# AND NORTHWESTERN UNIVERSITY

Northwestern University ("Northwestern") gratefully acknowledges the generosity of Neurodegenerative Disease Research Inc. (the "Donor") in executing this gift agreement to support Northwestern (the "Gift Agreement"). This Gift Agreement represents the final understanding between the Donor and Northwestern, and supersedes any prior understandings, including a letter dated June 17, 2021 from the Donor.

1. **Gifts and Schedule.** The Donor intends to give $12,500,000 in cash (the "Gifts") to Northwestern according to the following schedule:

    | Gift Amount: | By No Later Than: |
    |---|---|
    | $1,250,000 | July 31, 2021 |
    | $1,250,000 | January 31, 2022 |
    | $1,250,000 | July 31, 2022 |
    | $1,250,000 | January 31, 2023 |
    | $1,250,000 | July 31, 2023 |
    | $1,250,000 | January 31, 2024 |
    | $1,250,000 | July 31, 2024 |
    | $1,250,000 | January 31, 2025 |
    | $1,250,000 | July 31, 2025 |
    | $1,250,000 | January 31, 2026 |

2. **Designation of the Gifts.** The Gifts shall be added to the **Neurodegenerative Disease Research/Siddique Lab ALS Discovery Fund** (the "Fund"). The Fund is administered by Northwestern's Feinberg School of Medicine ("Feinberg"), by the Les Turner Foundation/Herbert C. Wenske Foundation Professor, which position is currently held by Dr. Teepu Siddique. The Fund shall be administered in accordance with applicable Northwestern policies and practices, including those on investment, spending, and budgeting, which may change from time to time. The Fund shall be used to study amyotrophic lateral sclerosis (ALS) in the laboratory of Dr. Teepu Siddique and under his direction.

3. **Compliance.** The Donor and Northwestern agree to comply with all applicable laws and regulations in making, accepting, and administering the Gifts. In particular:

   * As required by IRS regulations for charitable gifts, the Donor shall not receive any personal benefit in exchange for facilitating the Gifts, nor shall the Donor have any control of the Gifts once received by Northwestern.



WE WILL.
The Campaign for Northwestern

EXHIBIT B

DocuSign Envelope ID: F9CB6564-6E83-4E29-AD9D-89A25154B5A8

FILED DATE: 3/14/2025 2:52 PM  2025L003685

- Northwestern shall comply with Section 117 of the Higher Education Act, which specifies a reporting requirement for gifts from foreign sources, including gifts from agents of foreign sources. The Donor confirms it is not funded by foreign sources within the meaning of the Higher Education Act.

4. **Recognition.** The Donor may be acknowledged in applicable Northwestern recognition societies and honor rolls, which may be in print or digital format.

5. **Stewardship.** Stewardship shall be in accordance with standard practices, as they may change from time to time. Under current practices, Feinberg shall prepare an annual report about the use of the Fund for the Donor, until the Gifts are fully expended.

6. **Planning for the Future.** If changed circumstances make it impossible, impractical, or inadvisable for Northwestern to implement the purpose of the Fund as originally envisioned, that is to honor the intent of the Gifts, the Donor will be advised by Northwestern and the pledge payments will cease. Any changes or modifications due to changed circumstances agreed to by the Donor will be attached to this Gift Agreement. If the changes or modifications are not agreeable to the Donor, Northwestern will be notified in writing and future pledge payments will cease. (As required by IRS regulations for charitable gifts, Northwestern will retain any already-received gifts.)

DocuSign Envelope ID: F9CB6564-6E83-4E29-AD9D-89A25154B5A8

FILED DATE: 3/14/2025 2:52 PM 2025L003685

This Gift Agreement is dated this \_\_\_12\_\_\_ day of \_\_\_July_____, 2021.

**NEURODEGENERATIVE DISEASE RESEARCH INC.**

By: *Siobhan Ellison*
Siobhan Ellison, DVM, PhD
President

**NORTHWESTERN UNIVERSITY**

By: *EG Neilson*
Eric G. Neilson, MD
Vice President for Medical Affairs and
Lewis Landsberg Dean of Northwestern
University Feinberg School of Medicine

By: *[signature]*
Robert E. McQuinn
Vice President
Alumni Relations and Development