UNINTED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEURODEGENERATIVE DISEASE RESEARCH, INC., | ) ) ) | Case No. 25-cv-02775 |
| Plaintiff, | ) ) | Judge Mary M. Rowland |
| v. | ) ) | |
| NORTHWESTERN UNIVERSITY, | ) ) | |
| Defendant. | ) ) ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Neurodegenerative Disease Research, Inc. ("NDR"), by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) now brings this First Amended Complaint against Northwestern University ("Northwestern") and states as follows:

**Parties**

1.      Plaintiff NDR is an I.R.S. 501(c)(3) nonprofit organization incorporated and headquartered in Florida. NDR is therefore a citizen of Florida.

2.      Defendant Northwestern is a private university incorporated in Illinois and headquartered in Cook County, Illinois. Northwestern is therefore a citizen of Illinois.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because the plaintiff and defendant are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

1

4.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because Defendant Northwestern resides in this district and a substantial part of the events and omissions giving rise to NDR's claims occurred in this district.

## Factual Allegations

### NDR Is Founded with the Goal of Finding a Cure for ALS

5.     Amyotrophic Lateral Sclerosis, commonly referred to as ALS or Lou Gehrig's Disease (hereinafter, "ALS"), is a rare, progressive disease that causes deterioration of nerve cells in the brain and spinal cord. The disorder affects motor neurons, which control voluntary muscle movement, including talking, walking, chewing, and breathing. No cure or effective treatment for ALS has yet been discovered. The average lifespan of an individual with ALS, following the onset of symptoms, is three to five years.

6.     Dr. Siobhan Ellison, the president of Plaintiff NDR, holds a Doctor of Veterinary Medicine (DVM) and a Ph.D. in molecular biology from the University of Florida. She has extensive experience in research involving the discovery of causes of rare diseases in horses and the development of pharmaceutical treatments for those diseases. She has developed repurposed pharmaceuticals that are currently in use in veterinary medicine.

7.     Though a highly accomplished scientist and researcher, Dr. Ellison is not trained as a physician. Prior to her involvement with NDR, Dr. Ellison had no substantial knowledge of ALS, no knowledge of the state of the art in the research or treatment of ALS, and no training or experience relating to the development of treatments for ALS, or in clinical or scientific research relating to ALS.

2

172440156v4

8.      In 2019, Richard,[1] a dear friend of Dr. Ellison's, was diagnosed with ALS. Richard had substantial resources and was aware of Dr. Ellison's history of developing effective pharmaceutical drugs for the treatment of neurological diseases in horses. He volunteered to fund a brick-and-mortar laboratory that Dr. Ellison could use to direct the study treatments for ALS.

9.      Dr. Ellison persuaded Richard that it would be more effective to start a funding platform that could be used to finance promising ALS research, rather than starting a new laboratory. This model would allow Richard and Dr. Ellison to leverage and rely upon existing researchers' expertise, laboratory personnel, equipment, and connections, all of which would lead to a more efficient search for a cure for ALS. The proposed research funding platform would publish the results of all its research to help researchers around the world in their search for a cure.

10.     Dr. Ellison agreed to direct the ALS research funding platform to be financed by Richard. To enable herself to identify the most promising avenues for ALS research, Dr. Ellison visited universities and research institutions around the country to consult with leaders in the field of ALS research. She also read more than 600 research articles on ALS in order to familiarize herself with the current state of scientific research on the topic. Dr. Ellison then developed a funding algorithm that would enable her to analyze proposed ALS research studies and determine which were the most promising studies to fund with the money Richard wished to donate to the cause.

11.     In January 2020, Dr. Ellison began enrolling ALS researchers to receive funding from Richard. In March 2020, she founded NDR, which was financed entirely by Richard. NDR

---

[1] Richard's last name is omitted from this Complaint out of respect for his desire that his substantial charitable donations toward ALS research remain anonymous.

3

immediately began distributing money to the researchers.

**NDR Begins Discussions with Dr. Siddique Regarding Prospective ALS Research**

12.     Dr. Ellison first became aware of Dr. Teepu Siddique in October 2020 through her work with NDR. At the time, NDR was considering whether to fund research seeking to develop a protocol to use a drug called MW150 for the treatment of ALS. One of the researchers with whom Dr. Ellison was discussing this possibility suggested that Dr. Ellison speak with Dr. Siddique. The researcher suggested it would be valuable to speak with Dr. Siddique because Dr. Siddique had conducted mouse trials with MW150, was in possession of raw data relating to the effectiveness of MW150, and was qualified to write the protocol for an ALS feasibility study.

13.     Dr. Siddique is a physician-scientist and neurogeneticist internationally recognized as a preeminent expert in the study of ALS, with a scientific career spanning more than 40 years. He has conducted pioneering research on the causative genes for the inherited form of ALS. He helped to develop the first transgenic animal model for any neurodegenerative condition (ALS), which remains the most robust model for studying ALS and is the foundation for about 1,600 scientific publications. His laboratory connected the pathology of most forms of ALS and dementia accompanying ALS to the function of specific genes identified in his laboratory. Dr. Siddique's laboratory also made the first mouse model approximating the pathology of ALS, which helped to simplify and hasten the process of ALS drug screening. These are only a few of Dr. Siddique's important contributions to the field of ALS research, a field in which Dr. Siddique is widely regarded as a leading scientific mind.

14.     As of December 2020, Dr. Siddique was employed by Northwestern University's Feinberg School of Medicine as an endowed chair and Professor in the Departments of

4

172440156v4

Neurology, Cell and Developmental Biology, and Pathology. Dr. Siddique's laboratory was located at Northwestern, and Dr. Siddique directed the laboratory in his capacity as an employee of Northwestern. Dr. Siddique had been employed by Northwestern since 1991.

15.     Dr. Ellison first spoke with Dr. Siddique in December, 2020. In this and subsequent conversations with Dr. Ellison, Dr. Siddique repeatedly advised Dr. Ellison of his many accomplishments in the field of ALS research and his high stature in the ALS research community.

16.     In discussions and email correspondence between Dr. Ellison and Dr. Siddique between December 2020 and March 2021, it emerged that, although Dr. Siddique did not believe MW150 was a promising treatment for ALS, he had conceived of other promising research initiatives. For instance, Dr. Siddique proposed to conduct phase-1 studies on the efficacy of Imatinib®. Dr. Siddique claimed that he could apply to the U.S. Food & Drug Administration ("FDA") one month after receiving funding, and in 60 days could begin the proposed phase-1 Imatinib® trial.

17.     Dr. Siddique also proposed to Dr. Ellison studies which later became known as the "Ubiquisome Project." Dr. Siddique told Dr. Ellison he had researchers in his laboratory uniquely suited to run these studies. He also characterized the Ubiquisome Project as a "cure" for Richard, telling Dr. Ellison that if Richard's cells could tolerate the Ubiquisome repairing treatment, he would be the first patient to be treated using it.

18.     After speaking with Dr. Siddique, Dr. Ellison analyzed the research Dr. Siddique had proposed using the NDR funding algorithm she had developed. The algorithm identified Dr. Siddique's research as by far the most promising that had come to NDR's attention.

5

19.     In or around January 2021, Andrew Christopherson, Assistant Dean for Development at Northwestern's Feinberg School of Medicine, visited Dr. Ellison at her laboratory in Florida. During this visit, Mr. Christopherson exuberantly praised Dr. Siddique to Dr. Ellison, emphasizing how much Dr. Siddique had accomplished at Northwestern and how much valuable research was produced by Dr. Siddique's laboratory at Northwestern.

20.     During Dr. Ellison's ongoing discussions with Dr. Siddique, Dr. Siddique suggested that NDR make a gift to Northwestern to be particularly designated to funding the ALS research Dr. Siddique's laboratory was conducting.

21.     Speaking for NDR, Dr. Ellison affirmed that NDR was willing to make such a gift.

**NDR and Northwestern Execute the First Gift Agreement**

22.     Dr. Siddique and Dr. Ellison agreed that NDR would fund the Imatinib® and Ubiquisome projects. Based on her conversations with Dr. Siddique and Mr. Christopherson, Dr. Ellison at all times contemplated that Dr. Siddique would direct these projects. Dr. Siddique had conceived of and proposed to direct the projects, and had represented to Dr. Ellison that he and the other researchers in his laboratory were uniquely qualified to carry out the projects.

23.     On or about April 6, 2021, NDR and Northwestern executed their first gift agreement (the "First Gift Agreement"). The purpose of the First Gift Agreement was for NDR to provide Dr. Siddique and Northwestern with the funding Dr. Siddique would need to carry out the Imatinib® trial and the Ubiquisome Project. A true and correct, partially-executed version of the First Gift Agreement is attached hereto as **Exhibit A**.

24.     Northwestern drafted the First Gift Agreement aside from one change to the final

6

paragraph of the agreement.

25.     Under the First Gift Agreement, NDR agreed to donate $1,610,000 to an "expendable fund" held by Northwestern by June 30, 2023, pursuant to a schedule laid out in the agreement.

26.     The First Gift Agreement provided that the fund into which NDR's gift would be deposited "shall be used to research on amyotrophic lateral sclerosis (ALS) at the laboratory of Dr. Teepu Siddique, or its successor." Ex. A, 1st Gift Agmt. § 2.

27.     The First Gift Agreement provided that "stewardship" of NDR's gift "shall be in accordance with standard practices, as they may change from time to time." *Id.* § 3. It further provided that "Feinberg shall prepare an annual report about the use of the Fund for the Donor, until the Gift is fully expended." *Id.*

### NDR and Dr. Siddique Plan the "Big Project"—a Major Research Initiative with a Five-Year Time Horizon

28.     After the parties entered into the First Gift Agreement, Dr. Ellison and Dr. Siddique continued to discuss additional ALS research projects that might be undertaken by Dr. Siddique's laboratory. Dr. Siddique suggested that Dr. Ellison and NDR consider funding what the parties would come to call "the Big Project."

29.     The Big Project involved running the most recently developed DNA and RNA analysis on human post-mortem tissues and blood samples, analyzing the results, then loading the data into a database platform that could be accessed by researchers around the world, all in an effort to spur global progress toward a cure for ALS. Dr. Siddique was uniquely equipped to carry out the Big Project because, over the course of his decades-long career, he had established a bank containing a large amount of tissue and blood samples, and he had the medical records

7

and patient histories associated with those samples. In addition, Dr. Siddique and the researchers he had trained and who worked under his direction had unique expertise and know-how, including the ability to perform single-cell isolations from very specific regions of brain tissues. This combination of tissue samples, medical records and expertise was indispensable to the success of the Big Project.

30.     In his communications with Dr. Ellison and NDR, Dr. Siddique repeatedly confirmed that the Big Project would be a long-term project. For instance, on May 27, 2021, Dr. Siddique made a presentation to Dr. Ellison and Richard about the Big Project. During the presentation, Dr. Ellison stated that NDR and Dr. Siddique had a five-year plan for the Big Project, with milestones along the way. In response, Dr. Siddique confirmed, "Yeah." During the presentation, Dr. Siddique, Dr. Ellison and Richard all agreed on a plan under which NDR would commit to one year of funding for the Big Project, with additional funding to follow in subsequent years if the research proved promising.

31.     On June 17, 2021, Dr. Siddique sent an email to Dr. Ellison in which he proposed that NDR fund the Big Project by making payments of $2.5 million each year, for five years, to Dr. Siddique and his laboratory.

32.     The same day, Dr. Ellison replied to Dr. Siddique's email, on behalf of NDR, writing, in relevant part:

> OK, that budget is fine so long as you think this will achieve our goals. *I need the piece of paper that directs all money to a place that won't divert a penny . . . that you are in charge of it* and we will pay ½ a year at a time based on some very loose, agreeable goals. As soon as I have that I will transfer funds.

(Emphasis added.)

33.     Later on June 17, 2021, Dr. Siddique replied to Dr. Ellison's email, writing, in

8

relevant part:

> The checks have to be made ot [sic] Northwestern University, as a tax-exempt organization with pledge letter for the entire period and an explicit statement expressing the intent of the explicit donor as to the purpose of the funds and under whose supervision the funds would be expended as agreed in our discussions.

34.     Northwestern prepared a draft of a new gift agreement under which NDR's donation for the Big Project would be made, and distributed its draft to NDR on June 24, 2021.

35.     After reviewing the draft agreement Northwestern had prepared, Richard wrote to Dr. Ellison, via email:

> [W]hile I do want to support/promote this research, understand that it will take years to make progress and while I appreciate the reputation of the institution and participants I am not going to commit myself to multiple years at this point. It is going to have to be earned. Medical research is hard and results do not always come as expected so this effort does indeed call for a multi year contribution, however based on past experience with making these kinds of gifts to universities, it is my intent to continuously evaluate the value of the effort and how the dollars are accounted for throughout.

36.     Because of Richard's desire not to commit to five years' worth of donations to Northwestern without express milestones, Dr. Ellison emailed Dr. Siddique on June 28, 2021 and stated that NDR needed to structure the agreement as a grant by year, with a review to occur 45 days prior to each year's funding.

37.     However, Dr. Siddique consistently pressured NDR to make a five-year commitment, and dissuaded NDR from making shorter-term donations to Northwestern. In response to Dr. Ellison's June 28, 2021 email, Dr. Siddique wrote to Dr. Ellison that "gifts are faster" and have "more flexibility." Dr. Siddique also cautioned Dr. Ellison that "sponsored programs have other guidelines and go through the research office which will take time for approval."

9

38.     Also on June 28, 2021, Dr. Siddique sent Dr. Ellison, via email, a five-year outline budget for the Big Project. Dr. Siddique explained in his email that "Activities are spread over years to accommodate the budget." Dr. Siddique went on to write that the Big Project was a "major undertaking" and that "I don't want to do it if it's tentative." In short, Dr. Siddique encouraged NDR to commit five years' worth of funding up front rather than agreeing to submitting money on a year-by-year basis contingent on the achievement of milestones.

39.     In discussing NDR's prospective gift to Northwestern on June 30, 2021, Richard wrote to Dr. Ellison:

> I think the only thing left is making it clear that while the intent is a multi year gift, each gift will be a reflection of the enthusiasm and creativity of the program as put together by Dr. Saddique [sic] *and support he receives from NWU*. We recognize he is trying to do something that has so far confounded humanity. *He is unique in his background in the study and treatment of ALS and fir* [sic] *his enthusiasm for a greater understanding as well as treatments for the disease.*

(Emphasis added.)

40.     On July 8, 2021, Mr. Christopherson of Northwestern sent an email to Dr. Ellison of NDR attaching a draft contract for NDR's review. Mr. Christopherson wrote, in the body of his email, "[A]ttached please find an advance copy for the gift agreement outlining NDR's support of ALS research *conducted by Dr. Siddique and his laboratory*." (Emphasis added.) Mr. Christopherson closed his email by writing, "Many thanks, Dr. Ellison, for your continued philanthropic support *of Dr. Siddique's research* and partnership in the fight against ALS." (Emphasis added.)

41.     The draft agreement Northwestern proposed ended its second paragraph with the sentence: "The Fund shall be used to study amyotrophic lateral sclerosis (ALS) in the laboratory of Dr. Teepu Siddique, or its successor." NDR required the removal of the words "or its

10

successor" and their replacement with "and under his direction" in order to sign.

**NDR and Northwestern Execute the Second Gift Agreement**

42.     On or about July 12, 2021, NDR and Northwestern executed their second gift agreement (the "Second Gift Agreement"). The purpose of the Second Gift Agreement was for NDR to provide Dr. Siddique and Northwestern with the funding Dr. Siddique would need to carry out the Big Project. A true and correct copy of the Second Gift Agreement is attached hereto as **Exhibit B**.

43.     Eric G. Neilson, Vice President for Medical Affairs and Lewis Landsberg Dean of Northwestern University's Feinberg School of Medicine, was one of the individuals who signed the Second Gift Agreement on behalf of Northwestern.

44.     Under the Second Gift Agreement, NDR agreed to donate $12.5 million to Northwestern, which money was to be added to what the agreement called the "Neurodegenerative Disease Research/Siddique Lab ALS Discovery Fund." Ex. B, 2d Gift Agmt. §§ 1–2. Under the agreement, NDR was to make these gifts via semiannual payments to Northwestern of $1.25 million, to be made between July 31, 2021 and January 31, 2026. *Id.* § 1.

45.     The Second Gift Agreement provided that the fund into which NDR's gift would be deposited "shall be used to research on amyotrophic lateral sclerosis (ALS) at the laboratory of Dr. Teepu Siddique and under his direction." *Id.* § 2.

46.     The Second Gift Agreement provided that "stewardship" of NDR's gift "shall be in accordance with standard practices, as they may change from time to time." *Id.* § 5. It further provided that "Feinberg shall prepare an annual report about the use of the Fund for the Donor, until the Gift is fully expended." *Id.*

**Northwestern and Dr. Siddique Carefully Conceal from NDR that Their Relationship Is at a Breaking Point**

47.     NDR was aware of Dr. Siddique's experience and reputation as a prominent ALS researcher, and Dr. Siddique had many times himself informed NDR of this. NDR was also aware of Northwestern's experience and reputation as a respected and well-established research institution and university. NDR was aware that Northwestern frequently received, managed, stewarded, and used funds from donors in the ordinary course of its operations.

48.     As a nonprofit organization accepting donations in Illinois, Northwestern owed ethical obligations to its donors and prospective donors. The Illinois Attorney General's Office recommends that nonprofit organizations follow the Illinois Nonprofit Principles and Best Practices developed by the Preserving the Public Trust Task Force. *See* **Exhibit C**, Office of the Attorney General, *Charities and Donating*, illinoisattorneygeneral.gov/consumer-protection/charities/building-better-charities (last visited Apr. 25, 2025); **Exhibit D**, Illinois Nonprofit Principles and Best Practices 2020, myforefront.org/wp-content/uploads/2019/09/Nonprofit-Best-Practices-2020.pdf (last visited Apr. 25, 2025).

49.     The practices recommended by the Illinois Attorney General include the duty of nonprofit organizations to "[d]isclose important and relevant information to potential donors." *Id.* § 11(b), at 12.

50.     The practices recommended by the Illinois Attorney General also include the duty of nonprofit organizations to "[e]nsure donated funds are used for purposes consistent with the donor's intent, whether as described in the relevant solicitation materials or as specifically directed by the donor . . . ." *Id.* § 11(e), at 12.

51.     Indeed, Northwestern's own Standards for Business Conduct require that

12

Northwestern employees practice sound "stewardship" over university resources, which include funds received from donors. *See* **Exhibit E**, Northwestern Standards of Business Conduct at 1–2. Among other things, Northwestern's Standards for Business Conduct require faculty and staff of the university to "use University resources prudently and only for their intended purposes," and to "avoid waste and improper use" of such resources. *Id.*

52.     NDR trusted and relied upon Dr. Siddique and Northwestern, reasonably believing that they would not accept donations from NDR if they had reason to believe those donations could not be used for the purpose for which NDR stated it wished the donations to be used. NDR also reasonably trusted and relied upon Northwestern to disclose to it information readily known to Northwestern and highly material to NDR's prospective, large donations to the university. NDR's had a special and/or fiduciary relationship with Northwestern and Dr. Siddique that created a duty by Northwestern to disclose facts material to NDR's prospective donations to NDR.

53.     But despite all this, while NDR was negotiating multi-year, multi-million-dollar donation contracts with Northwestern to fund long-term ALS research projects to be directed by Dr. Siddique specifically, the relationship between Northwestern and Dr. Siddique was quickly deteriorating, imminently threatening the prospective research to which NDR was considering committing its funds. NDR was completely unaware of this critical fact, and Northwestern carefully concealed it from NDR throughout the parties' entire course of negotiating the gift agreements.

54.     On July 2, 2019, Dr. Siddique had filed a complaint against Northwestern and affiliates, as well as Dean Eric G. Nielson, in the Circuit Court of Cook County, Illinois. A copy

of the Amended Complaint in that litigation is attached hereto as **Exhibit F**.

55.     The causes of action asserted in Dr. Siddique's lawsuit included breaches of contract by the Northwestern Medical Faculty Foundation as well as interference with Dr. Siddique's employment contract by Northwestern itself, Dean Neilson, and others at the university.

56.     The allegations Dr. Siddique asserted in his complaint included that Dimitri Krainc, Chair of the Feinberg School of Medicine's Department of Neurology,

> deliberately and maliciously undermined [Dr. Siddique's] reputation by denigrating his accomplishments to others in the [Northwestern] community, announcing at the state of the department faculty and staff meeting in 2016 that [Dr. Siddique] had been put 'out to pasture,' in the presence of Defendant [Dean] Neilson and the head of NMHC Dean M. Harrison and Andrea Pauls Backman, the Executive Director of the Les Turner ALS Foundation. He followed this up with an email to the <u>entire</u> [Northwestern] Feinberg neurology faculty that he was actively looking to fill [Dr. Siddique's] position. [Dr. Siddique] only learned of this search from the email.

> 35.    In 2016, Krainc, without [Dr. Siddique's] advance knowledge, advertised for an academic neurologist to become Director of a new Les Turner ALS Research and Patient Center, effectively seeking to eliminate [Dr. Siddique's] position, responsibility, and authority.

Ex. C, Am. Compl. ¶¶ 34–35 (underline in original).

57.     Dr. Siddique's complaint further alleged that Neurology Department officials had taken actions to undermine his authority and limit his ability to engage in research. Dr. Siddique concluded his allegations by stating, "The cumulative effect of the foregoing misconduct . . . has been to intentionally, deliberately, and maliciously *attempt to dismantle, cripple, and ultimately render ineffective, [Dr. Siddique's] research* and clinical *work in order to force him out of his position* by setting him up for failure, all in breach of his Contract." *Id.* ¶ 44 (emphasis added).

58.     Dr. Siddique, Mr. Christopherson, Dean Neilson, attorneys in Northwestern's legal

14

department, and other agents of Northwestern knew of the existence of the lawsuit and the allegations made therein prior to the time that NDR first contacted Dr. Siddique about possible collaboration. Yet, no one from Northwestern informed NDR of the serious dispute between it and Dr. Siddique at any time during the months of negotiations in which NDR contemplated donating millions of dollars to Northwestern for Dr. Siddique's research.

59.     Dr. Siddique, Mr. Christopherson, Dean Neilson, and others at Northwestern understood that NDR would likely be hesitant to agree to multi-year donation agreements if it knew that Dr. Siddique—the individual whose participation was essential for NDR—was especially likely to part ways with Northwestern given his acrimonious dispute with the university. They therefore purposefully and fraudulently concealed the dispute from NDR in an effort to induce NDR to make large donations to Northwestern.

60.     NDR did not learn of the dispute between Northwestern and Dr. Siddique until near the end of 2022, when Dr. Siddique revealed to NDR that he was going to leave Northwestern.

61.     Dr. Siddique entered into a settlement agreement of his lawsuit against Northwestern on or about February 17, 2022. The case was dismissed by stipulation on February 22, 2022. Dr. Siddique has refused to provide NDR with a copy of his settlement agreement with Northwestern on the ground that it allegedly includes a nondisclosure provision.

62.     Dr. Siddique's position at Northwestern terminated as of February 1, 2023. On information and belief, Dr. Siddique has sought, but not obtained, another position since his separation from Northwestern. On information and belief, Dr. Siddique's separation from Northwestern was required under the terms of his settlement agreement with Northwestern.

15

**Coincident with Dr. Siddique's Departure, Northwestern Fails to Make Any Material Progress on the Research Initiatives for Which NDR Donated Millions**

63.     Under the First Gift Agreement and Second Gift Agreement, NDR made payments to Northwestern totaling $3.36 million.

64.     Though both the First Gift Agreement and Second Gift Agreement required Northwestern to prepare an annual report for NDR about the use of funds created under the agreements, Northwestern has never prepared an annual report relating to either agreement, and never provided such an annual report to NDR.

65.     As a result, to this day NDR does not know how the $3.36 million dollars it donated to Northwestern were spent, or the extent to which its donations were used to fund the projects for which NDR ostensibly made the donations.

66.     Northwestern has claimed to NDR that some of the money donated under the Second Gift Agreement went toward purchasing an alarm system for a cryo-freezer to be used for storing tissue samples. However, Northwestern has never informed NDR how much the alarm system for the cryo-freezer cost, or what the other money NDR donated to Northwestern was used for, if anything.

67.     Tragically, no material progress on ALS research resulted from NDR's donation of millions of dollars to Northwestern's and Dr. Siddique's ALS research laboratory.

68.     Dr. Siddique never put in an application to the FDA to run a phase-1 Imatinib® trial, as he had said he would do with funds provided under the First Gift Agreement.

69.     Nothing became of the Ubiquisome Project—the project that Dr. Siddique told Richard would produce a "cure" for his illness. Nobody from Northwestern ever informed NDR of the results of this project.

70.     Dr. Siddique's departure from Northwestern effectively killed the Big Project. With Dr. Siddique gone, nobody from Northwestern had the knowledge or skill to direct the Big Project, nor did they have Dr. Siddique's knowledge of the patient and case histories behind the tissue samples to be used for the Big Project, which were indispensable to the Project's success. Indeed, NDR was recently informed by a Northwestern researcher that Northwestern does not know how the tissue samples are organized and cannot use them. All of these samples, painstakingly procured by Dr. Siddique and others over decades, are apparently going to waste.

71.     Richard died in 2024. The cure Dr. Siddique had promised never materialized. Worse, the Big Project on which Richard had hung so much hope, not for himself but for ALS patients of the future, is as far from realization now as it was before NDR donated its millions to Northwestern's ALS research program.

## COUNT I
## Fraudulent Concealment

72.     NDR incorporates and realleges the foregoing paragraphs, as though fully set forth herein.

73.     At all times during the negotiation of the First Gift Agreement and Second Gift Agreement, Northwestern concealed from NDR that it was in a bitter dispute with Dr. Siddique which was substantially likely to result in Dr. Siddique's departure from Northwestern.

74.     Dr. Siddique's continuing presence at Northwestern was critically important to NDR because Dr. Siddique was the only individual with the training, experience, skill, knowledge, and tissue samples needed to carry out the research NDR hoped to fund by making donations to Northwestern.

75.     Northwestern—including Dr. Siddique, Mr. Christopherson, and Dean Neilson—

17

intentionally concealed Dr. Siddique's ongoing dispute with Northwestern from NDR, knowing that NDR would likely not be willing to donate millions of dollars to the university if it were aware that Dr. Siddique's continuing employment by the University was so imminently endangered.

76.     NDR in fact would not have been willing to sign the First Gift Agreement or Second Gift Agreement if it had known of the dispute between Dr. Siddique and Northwestern.

77.     Northwestern had a duty to disclose to NDR that it was engaged in an acrimonious dispute with Dr. Siddique that was substantially likely to end in Dr. Siddique's separation from the university. NDR placed trust and confidence in Dr. Siddique and Northwestern, because of their experience and reputations as respected and established researchers/institutions, that they would not accept large amounts of money from a donor without being reasonably confident that the money could be used for the purposes for which the money was donated. NDR also trusted that Northwestern would disclose information in its possession material to NDR's prospective donations to the university as an Illinois nonprofit organization with professional and ethical obligations to do so. In addition, Northwestern well knew that NDR intended its donations to be used for research to be conducted by Dr. Siddique specifically, and that this research would take years to come to fruition, creating additional circumstances imposing a duty on Northwestern to disclose its dispute with Dr. Siddique.

78.     NDR could not have discovered the dispute between Dr. Siddique and Northwestern through reasonable inquiry. Neither Dr. Siddique, nor Mr. Christopherson, nor anyone else at Northwestern said anything to NDR in the parties' entire course of communication to suggest that Dr. Siddique's 30-year employment at Northwestern was anything but entirely

172440156v4

secure and assured.

79.     NDR relied upon Northwestern's silence to its detriment. The millions of dollars it donated to Northwestern have not funded the important research for which NDR donated the money, and have essentially been wasted. NDR has been damaged in the amount of its contributions made and the loss of the use of those funds, which it might otherwise have applied to funding productive ALS research.

WHEREFORE, NDR prays for judgment in its favor and against Northwestern, rescission of the First Gift Agreement and the Second Agreement and restoration of the status quo ante, compensatory damages, punitive damages, costs, an equitable accounting, and any other and further relief that the Court deems just and proper.

## COUNT II
### Breach of Contract – First Gift Agreement and Second Gift Agreement

80.     NDR incorporates and realleges the foregoing paragraphs, as though fully set forth herein.

81.     The First Gift Agreement and Second Gift Agreement are valid and enforceable contracts.

82.     NDR performed its obligations under the First Gift Agreement and Second Gift Agreement.

83.     Northwestern breached the First Gift Agreement and Second Gift Agreement by failing and refusing to provide any of the annual reports regarding the use of donated funds required by the agreements.

84.     NDR has been harmed by Northwestern's breaches of the First Gift Agreement and Second Gift Agreement in that it has been deprived of Northwestern's performance of a

19

material term in the agreements, and has been unable to ascertain how the millions of dollars it donated to Northwestern were spent.

WHEREFORE, NDR prays for judgment in its favor and against Northwestern, rescission of the First Gift Agreement and the Second Gift Agreement, specific performance of Northwestern's reporting obligations under the agreements, and any other and further relief that the Court deems just and proper.

## COUNT III
### Equitable Accounting

85. NDR incorporates and realleges the foregoing paragraphs, as though fully set forth herein.

86. As alleged herein, Northwestern failed and refused to provide annual reports to NDR regarding the use of the millions of dollars NDR donated to Northwestern.

87. NDR has no adequate remedy at law. To the extent the relief requested by NDR in Count II of this Complaint seeks relief akin to an equitable accounting, this Count is pleaded in the alternative to Count II.

88. The funds NDR donated to Northwestern, and as to which NDR seeks an accounting, were procured by fraud by Northwestern, as alleged in this Complaint.

89. The funds NDR donated to Northwestern, and as to which NDR seeks an accounting, were procured by Northwestern's breach of a fiduciary or other special relationship with NDR, as alleged in this Complaint.

90. A determination of how NDR's donations to Northwestern were used will require accounting of a complex nature.

WHEREFORE, NDR prays for judgment in its favor and against Northwestern, an

172440156v4

equitable accounting, and any other and further relief that the Court deems just and proper.

## JURY DEMAND

NDR demands a trial by jury on all issues so triable.


Dated: April 28, 2025                                    Respectfully submitted,

                                                 /s/ Eugene E. Endress

                                                 Peter E. Deegan
                                                 Eugene E. Endress
                                                 TAFT, STETTINIUS & HOLLISTER LLP
                                                   111 E. Wacker Dr., Ste. 2600
                                                 Chicago, IL 60601
                                                 Phone: (312) 527-4000
                                                 Fax:    (312) 527-4011
                                                 pdeegan@taftlaw.com
                                                 gendress@taftlaw.com

                                                 *Attorneys for Plaintiff Neurodegenerative*
                                                 *Disease Research, Inc.*

21

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that he caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification of the filing of this document to all registered counsel of record, this 28th day of April, 2025.

/s/ Eugene E. Endress
*One of the Attorneys for Plaintiff*
*Neurodegenerative Disease*
*Research, Inc.*

172440156v4