# EXHIBIT F

FILED
7/10/2020 4:45 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L007321

9735641

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| **TEEPU SIDDIQUE, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 2019 L 007321** |
| | ) | |
| **NORTHWESTERN UNIVERSITY,** | ) | **Hon. James E. Snyder** |
| **NORTHWESTERN MEMORIAL** | ) | |
| **HEALTHCARE, NORTHWESTERN** | ) | **JURY DEMAND** |
| **MEDICAL FACULTY FOUNDATION** | ) | |
| **D/B/A NORTHWESTERN MEDICAL** | ) | |
| **GROUP, DIMITRI KRAINC, M.D., and** | ) | |
| **ERIC G. NEILSON, M.D.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

<u>**AMENDED COMPLAINT**</u>

Plaintiff, TEEPU SIDDIQUE, M.D., DSc. (*hc*) ("Dr. Siddique" or "Plaintiff") complains against Defendants, NORTHWESTERN UNIVERSITY, NORTHWESTERN MEMORIAL HEALTHCARE, NORTHWESTERN MEDICAL FACULTY FOUNDATION D/B/A NORTHWESTERN MEDICAL GROUP, DIMITRI KRAINC, M.D., and ERIC G. NEILSON, M.D. as follows:

### I.  Background

1.  Plaintiff is a physician-scientist, internationally recognized as an expert in neuromuscular diseases and a pioneering world-renowned neurogeneticist who has discovered multiple causative genes for the inherited form of amyotrophic lateral sclerosis (ALS), commonly known as Lou Gehrig's disease and other disorders.  Recently, his group also discovered a gene for Parkinson's disease.  ALS is a fatal disorder without a cure that kills its

FILED DATE: 7/10/2020 4:45 PM  2019L007321

victims within three to five years.  It is to understand and cure this disease that Dr. Siddique has dedicated over ~ 40 years of his life.

2.      Dr. Siddique's insight, as a leading scientist in disorders of neurodegeneration, lead to the first application of molecular genetics to ALS and the first cause of ALS was thus identified almost 127 years after the first description of ALS.

3.      He and his colleagues also developed the first transgenic animal model for any neurodegenerative condition (ALS), which remains the most robust model for studying ALS and is the foundation for about 1,600 scientific publications.  This model provided the insightful observation that toxicity of accumulating proteins in neurons is the primary mechanism of the disease, and therefore reducing the accumulating toxic proteins would potentially cure the disease.  Today, promising ALS therapy development is based on that basic paradigm to develop effective treatments.

4.      Subsequently, Dr. Siddique's laboratory connected the pathology of most forms of ALS and dementia accompanying ALS to the function of specific genes identified in his laboratory, further solidifying the evidence that the fundamental defect in ALS is the failure in quality control of toxic proteins.

5.      Dr. Siddique's laboratory also made the first mouse model approximating the dementia of ALS.  In this unique model, the accumulation of toxic proteins and their response to treatment can be directly visualized under a special microscope through a window in the skull of the living mouse, thereby simplifying and hastening the process of drug screening.

6.      Dr. Siddique and his colleagues have also identified small compounds that would reverse the accumulation of toxic proteins.  Analysis of targets of these compounds lead to the identification of a central enzyme complex in one of the two major protein recycling pathways in

2

cells. This enzyme could be expressed via gene delivery methods to enhance protein recycling. More recently and importantly, they successfully and safely used gene-editing techniques to correct the defect in the mouse model they made in 1993-94 and genetically "cured" it.

7.     The actions of Defendants Dimitri Krainc, M.D. and Eric G. Neilson, M.D. have slowed down the advancement of this kind of cutting-edge research.

8.     Dr. Siddique also works on other incurable neurological diseases. For example, he and a colleague discovered a novel form of inherited peripheral nerve disease and identified the gene causing it. Similarly, they discovered genes causing muscle and other neurological disorders. His laboratory recently engineered the first genetically humanized mouse model that can be used for drug screening for human sleeping sickness (HAT) and nagana ehich affects cattle, camels and other livestock, a devastating neurological disease endemic in Africa and now in the Carribean and South America. Eradication by effective treatment in livestock is estimated to benefit Africa by an estimated 2.5 billion US dollars over a 20 year period.

9.     Dr. Siddique's research has been continuously funded by the National Institutes of Health ("NIH") since 1985.

10.     Dr. Siddique is published with 160 peer-reviewed papers, hundreds of abstracts and several book chapters. He has given dozens of invited lectures, grand rounds and also organized national and international scientific meetings. His published work is in the top scientific and medical journals including Nature, Nature Genetics, Science, Proceedings of the National Academy of Sciences ("PNAS"), New England Journal of Medicine, and Annals of Neurology. Dr. Siddique has served on NIH study sections, reviewed for some of the most scientifically rigorous journals and European research funding organizations, and he currently serves on editorial boards of two scientific journals.

3

FILED DATE: 7/10/2020 4:45 PM 2019L007321

11.     Dr. Siddique's work is featured in Encyclopedia Britannica as well as in the book Altered *Fates: The Genetic Re-engineering of Human Life* by Jeff Lyon and Peter Gorner.  Over the years, Dr. Siddique's work has appeared in major print media, including the front pages of the Chicago Tribune, New York Times, Los Angeles Times, Wall Street Journal, and the weekly magazine Time.  He has appeared on international, national, and local TV news broadcasts.

12.     Dr. Siddique's work has attracted tens of millions of dollars in federal grants, gifts endowments and licensing fees from his patents to Northwestern University Feinberg School of Medicine and his research achievements have provided an anchor for fundraising by the Skokie-based Les Turner ALS Foundation.  Currently he holds an endowed chair and is Professor in the Departments of Neurology, Cell and Developmental Biology, and Pathology.  The reason cited by the chair of Pathology department for Dr. Siddique's appointment was his expertise in the pathology of ALS, recognized worldwide.  Per his contract as described herein, he should have continued as the Director of the Neuromuscular Disorders program at Northwestern University Feinberg School of Medicine.

13.     Dr. Siddique's research has been groundbreaking and of enormous public and scientific interest around the world.  He was the first to marshal an international collaboration for ALS genetics and subsequently lead a multi-institution consortium funded by the NIH for many years.

14.     In May 2018, Dr. Siddique received an honorary Doctor of Science degree from Lake Forest College, Illinois in recognition of his service to neuroscience and compassionate patient care.

15.     When Dr. Siddique came to Defendants Northwestern University and Northwestern Medical Faculty Foundation (now doing business as Northwestern Medical

4

Group), the Neuromuscular program had two clinic sessions per month. Under Dr. Siddique's leadership, the number of clinic sessions rose to 20 per month and 70-80% of all new patients with ALS in the ten million Greater Chicago Metropolitan area were seen in those clinics.

16. Dr. Siddique brought the prestigious Muscular Dystrophy Association Clinic ("MDA") to Defendant Northwestern Medical Faculty Foundation, and now doing business as Northwestern Medical Group, and obtained the Clinical Laboratories Improvement Amendments ("CLIA") certification for the Muscle Histochemistry Laboratory. Under Dr. Siddique's directorship, the neuromuscular medicine fellowship program at Northwestern University, one of the earliest ten in the nation, received approval from the Accreditation Counsel for Graduate Medical Education ("ACGME").

17. Dr. Siddique has mentored many clinicians and scientists. His laboratory has sponsored students from the Summer Research Opportunity Program ("SROP"), a program for underrepresented students who pursue graduate and research careers in the Big Ten Alliance Universities. In addition, Dr. Siddique's laboratory has sponsored one of the largest hands-on summer programs for high school, undergraduate, and medical students at Northwestern University Feinberg School of Medicine. Dr. Siddique is thus an accomplished physician-scientist, an astute clinician, as well as an effective teacher and administrator—a very rare combination.

18. Dr. Siddique has received all the major national and international awards for ALS research. He has been recognized as Top Doctor (Chicago Magazine and Castle Connolly) consecutively for the last 20 years.

19. Dr. Siddique's work on therapeutics of ALS is potentially worth scores of millions of dollars.

5

FILED DATE: 7/10/2020 4:45 PM 2019L007321

20.     Although Dr. Siddique has earned many accolades for his groundbreaking work, he has also incurred the unjustified animosity of powerful administrators, including Defendants Dimitri Krainc, M.D. and Eric G. Neilson, M.D.

## II.     Parties

21.     Plaintiff Teepu Siddique, M.D. is an individual who resides in Chicago, Illinois.

22.     Defendant Northwestern University ("NU") is a major educational, healthcare, and research Illinois not-for-profit corporation headquartered in the Chicago, Cook County, Illinois, metropolitan area.  NU is a private university that operates the Northwestern University Feinberg School of Medicine ("NU Feinberg").

23.     Defendant Northwestern Memorial HealthCare ("NMHC") is an Illinois not-for-profit corporation and the healthcare arm of NU.  It is the parent corporation and sole corporate member of Northwestern Medical Faculty Foundation d/b/a Northwestern Medical Group.

24.     Defendant Northwestern Medical Faculty Foundation d/b/a Northwestern Medical Group ("NMFF") is an Illinois not-for-profit corporation headquartered in Chicago, Cook County, Illinois and the clinical arm of NU Feinberg.  NMFF is closely affiliated with NU Feinberg, as "Northwestern Medicine" is a registered trademark of NMHC that is used by NMHC and NU Feinberg.

25.     Defendant Dimitri Krainc, M.D. ("Krainc") is an employee of NMFF.  Krainc is and was, at all times material herein, the Chair of the NU Feinberg Department of Neurology.  In 2015, Krainc was also a director, employee, and/or agent, apparent or otherwise, of NMHC.

26.     Defendant Eric G. Neilson, M.D. ("Neilson") is an employee of NMFF.  Neilson is and was, at all times material herein, the Chair of the Board of Directors for NMFF and Vice

6

FILED DATE: 7/10/2020 4:45 PM   2019L007321

President of Medical Affairs of NU and Dean of NU Feinberg. Neilson is also a director, employee, and/or agent, apparent or otherwise, of NMHC.

### III.   Jurisdiction and Venue

27.     The Court has jurisdiction over this dispute pursuant to Section 2-209 of the Illinois Code of Civil Procedure because Dr. Siddique negotiated and/or performed the contract at issue in Illinois.

28.     Venue is proper because the contract that is the subject of this litigation was negotiated and/or performed almost entirely in in Cook County.

### IV.   Background Facts Common to All Counts

29.     On or about August 9, 1990, Dr. Siddique received a formal offer of employment ("Offer") from Defendant NU, with "clinical responsibilities as an Attending Physician at then Northwestern Memorial Hospital (NMH) and a member of Northwestern Medical Faculty Foundation (NMFF)." A copy of the Offer is attached hereto as **Exhibit A**. At that time, he was employed as an Assistant Professor of Neurology, tenure track, at the Duke University Medical Center (School of Medicine).

30.     The Offer, among other things, proposed that:

    a.     Plaintiff would be appointed Associate Professor of Neurology; (Ex. A.)

    b.     Plaintiff would be appointed as the Neurology Department's <u>Director</u> of Research with responsibilities for developing its research program in neuromuscular disorders; (Emphasis added.)  (*Id.*)

    c.     Plaintiff would be the "<u>Director of the Neuromuscular Disorders Program and have direct supervision of the Les Turner ALS Foundation</u>

relationships, Lois Insolia ALS Clinic, and the muscle histochemical laboratory." (Emphasis added.) (*Id.*).

31.    On or about November 1, 1990, Plaintiff was presented with a contract of employment (the "Contract") by NMFF (now doing business as NMG), to become effective on January 1, 1991.  A copy of the Contract, is attached hereto as **Exhibit B**.

32.    The Contract provided, among other things, that:

a.    Plaintiff's duties would "include teaching, research, and clinical practice, as mutually agreed, (as) enumerated in Schedule 1, which is attached hereto, and made a part hereto, and made a part hereof by this reference." (*Id.*, ¶1.)

b.    the Contract "shall be renewed from year to year without further action, unless terminated by you or the Foundation…" (Emphasis added.)  (*Id.*, ¶3.)

c.    the Contract "shall be binding upon and inure to the benefit of the Foundation and you, and their respective heirs, legal representatives, executors, administrators, successors, and assigns."  (Emphasis added.) (*Id.*, ¶7.)

d.    "(n)o change or modification of this Agreement shall be valid unless the same be in writing and signed by you and the Foundation."  (*Id.*, ¶9(b).)

e.    "you may be terminated upon written notice, for any activity which impairs your ability to perform your professional and medical services to the Foundation…"  (*Id.*, ¶10.)

8

FILED DATE: 7/10/2020 4:45 PM   2019L007321

FILED DATE: 7/10/2020 4:45 PM   2019L007321

 f. Plaintiff shall "(d)irect the Neuromuscular Disorders program having direct supervision of the Les Turner Foundation Lois Insolia ALS Clinic, the Les Turner Foundation ALS Research Program, and the Department's muscle histochemical laboratory." (Emphasis added.) (Ex. B, Schedule 1, ¶B.3.)

 g. Plaintiff shall "(s)erve administratively as our Departmental <u>Director</u> of Research programs." (Emphasis added.) (*Id*., ¶C.1.)

 h. the Contract "shall be renewed from year to year <u>without further action</u>, unless terminated by you or the Foundation…" (Emphasis added.) (*Id*., ¶3.)

 i. the Contract "shall be binding upon and inure to the benefit of the Foundation and you, and their respective heirs, legal representatives, executors, administrators, <u>successors</u>, and assigns." (Emphasis added.) (*Id*., ¶7.)

 j. "(n)o change or modification of this Agreement shall be valid unless the same be in writing and signed by you and the Foundation." (*Id*., ¶9(b).)

 k. "you may be terminated upon written notice, for any activity which impairs your ability to perform your professional and medical services to the Foundation…" (*Id*., ¶10.)

 l. Plaintiff shall "(d)irect the Neuromuscular Disorders program having direct supervision of the Les Turner Foundation Lois Insolia ALS Clinic, the Les Turner Foundation ALS Research Program, and the Department's

9

FILED DATE: 7/10/2020 4:45 PM 2019L007321

muscle histochemical laboratory." (Emphasis added.) (Ex. B, Schedule 1, ¶B.3.)

m.    Plaintiff shall "(s)erve administratively as our Departmental <u>Director</u> of Research programs." (Emphasis added.) (*Id.*, ¶C.1.)

n.    Plaintiff accepted and signed the Contract and has, pursuant to that Contract, been continuously employed in good standing by NMFF (doing business as NMG) from January 1, 1991 to the present.

31.    Since the arrival of Defendant Krainc in 2013, and largely by his instigation, Defendants have engaged in a concerted effort to strip Plaintiff of his ability to carry out the work for which he was hired and which has elevated Defendants to the forefront of ALS research and neurogenetics.

32.    The last three NU Presidents, Arnold R. Weber, Henry S. Bienen and Morton Schapiro, have considered Dr. Siddique's research as the finest to come out of NU. In a visit to NU, Victor J. Dzau, M.D., a senior leader in U.S. medicine, former President and CEO of Duke University Medical Center and current (2014-2020) President of the U.S. National Academy of Medicine and a member of the American Academy of Arts and Sciences and the European Academy of Sciences and Arts publicly identified Dr. Siddique as a physician-scientist whose work is respected outside of NU.

33.    As a result of his groundbreaking and world-renowned research, as well as his ability to obtain NIH and other grant funding, Plaintiff's salary and remuneration has been steadily increased by NMFF since the execution of his Contract. Additionally, during his time with NMFF and NU, Plaintiff has received multiple patents for his work, which has allowed him and NU to receive additional royalty revenue from the licensing of his inventions.

10

34.     Despite Krainc's promise to Plaintiff in 2014 that "(n)othing will be taken away from you," Krainc has deliberately and maliciously undermined Plaintiff's reputation by denigrating his accomplishments to others in the NU community, announcing at the state of the department faculty and staff meeting in 2016 that Plaintiff had been put "out to pasture," in the presence of Defendant Neilson and the head of NMHC Dean M. Harrison and Andrea Pauls Backman, the Executive Director of the Les Turner ALS Foundation . He followed this up with an email to the entire NU Feinberg neurology faculty, many if not all of whom are NMFF employees, that he was actively looking to fill Plaintiff's position. Plaintiff only learned of this search from the email.

35.     In 2016, Krainc, without Plaintiff's advance knowledge, advertised for an academic neurologist to become Director of a new Les Turner ALS Research and Patient Center, effectively seeking to eliminate Plaintiff's position, responsibility, and authority.

36.     Moreover, Krainc has falsely claimed to be responsible for bringing neurogenetics to NU Feinberg, thereby appropriating for himself the reputation in neurogenetics established for NU by Plaintiff, when in fact Krainc knew it was Plaintiff's field, indeed the very reason Plaintiff was hired. Subsequently, Krainc renamed the Center for Rare Disorders, which he headed, as Center for Neurogenetics.

37.     In 2017, Defendants Krainc and Neilson hired Robert Kalb, M.D. ("Kalb") as Director of the Division of Neuromuscular Medicine, previously the Neuromuscular Program/Division, and Director of the new Les Turner ALS Center, making him responsible, instead of Plaintiff, for the Les Turner ALS Foundation relationships and the neuromuscular clinics. Kalb has far fewer contributions to ALS, neuromuscular research, and patient care than Plaintiff does.

11

FILED DATE: 7/10/2020 4:45 PM 2019L007321

38.     Even prior to Kalb's appointment, Defendant Krainc had hired Jinny O. Tavee, M.D. as faculty to the Neuromuscular Program/Division without informing or consulting the Plaintiff, thereby interfering with the long-standing established responsibilities of the Plaintiff as Director.

39.     Also, in 2017, the CLIA certified muscle histochemistry laboratory, directed by the Plaintiff, was closed on instructions from Defendant Krainc.  It is still not fully operational.

40.     Krainc and Neilson have also prevented Plaintiff from hiring staff in approved federally-funded positions and retaining staff via funding specifically earmarked for research under Dr. Siddique's direction by donor intent. For example, a very long-standing member of Dr. Siddique's team was moved out of Dr. Siddique's group and laboratory space, and was instead provided funding and space in a different building. Dr. Siddique came to learn about this after the fact, and neither Krainc nor Neilson discussed this matter with Dr. Siddique. This move resulted in further damage to Dr. Siddique's research efforts, as the Plaintiff had fostered, supported, and provided the funds, direction and resources for the collaboration with this team member for many years.

41.     In February 2020, Dr. Eileen Bigio, a long-standing neuropathologist collaborator with Plaintiff retired. Dr. Bigio had maintained rare postmortem tissue from ALS patients which Plaintiff, as the principal investigator of that research, had painstakingly obtained from across the country. This tissue was obtained by informed consent for Plaintiff's research, which was approved by the Institutional Review Board ("IRB") of NU Feinberg. Neither Krainc nor Neilson were involved in this project.

42.     Plaintiff and Dr. Bigio had agreed that on her departure, this tissue would be transferred back to Plaintiff's stewardship.  However, upon learning of the transfer of tissue back

12

to Plaintiff, Krainc and the Chair of Pathology interfered and stopped its transfer. This decision was ratified by Neilson and further hampered Plaintiff's ongoing funded research.

43.     In addition to the foregoing, Defendants Krainc and Neilson have committed, instigated, promoted and/or condoned the following hostile, deliberate, and malicious conduct towards Plaintiff including, but not limited to the following:

a.      Redirecting funds historically intended for Plaintiff's research to other projects;

b.      Inquiring about Plaintiff's health and frequently asking him why the Les Turner Foundation – a major donor to Plaintiff's research – should "keep writing him checks'', and making remarks such as "you are tough", 'the Les Turner folks don't like you", a mode of 'gas lighting' so that Plaintiff would  lose confidence and self-worth;

c.      Forcing Plaintiff, by cutting his discretionary funding from the Les Turner ALS Foundation, first by more than 60% and then by 80%, to reduce staffing and experiments.  By reducing the budget, Krainc was then able to hire Dr. Siddique's genetic counselor without Dr. Siddique's prior knowledge, and reassign Dr. Siddique's administrator for his program and laboratory who had worked for him for over 27 years, reducing laboratory morale and effectiveness;

d.      Forcing Plaintiff, by imposing such drastic budget cuts, to slow down the cutting-edge research his group has been doing, which could potentially be worth hundreds of millions of dollars, and thereby reduced Plaintiff's laboratory's competitive edge;

13

FILED DATE: 7/10/2020 4:45 PM   2019L007321

e. Forcing Plaintiff to pay for workplace counseling in response to a false, contrived complaint of harassment by another faculty member which he was compelled to defend, and which resulted in no findings against Plaintiff;

f. Discouraging or otherwise interfering with donors' contributions to Plaintiff's research;

g. Refusing to fund new and necessary equipment for Plaintiff's laboratory;

h. Promulgating the false narrative that Krainc – not Plaintiff – was responsible for the development and success of the neurogenetics program at NU Feinberg;

i. Authorizing or otherwise facilitating a reduction in Dr. Siddique's salary. This "pay cut" took effect on or about July 1, 2019; and

j. Failing to include Plaintiff's name, without Plaintiff's prior knowledge, on the attending schedule for the inpatient service during the period of July 1, 2016 to June 30, 2017.

44. The cumulative effect of the foregoing misconduct (¶¶ 34-45) has been to intentionally, deliberately, and maliciously attempt to dismantle, cripple, and ultimately render ineffective Plaintiff's research and clinical work in order to force him out of his position by setting him up for failure, all in breach of his Contract.

45. Additionally, the foregoing misconduct – including reducing Plaintiff's laboratory's competitive edge and removing his supervisory authority, in violation of his Contract – has stifled Plaintiff's crucial research discovery and advancements in ALS treatments

14

and consequently severely restricted his ability to advance his research to find lucrative commercial applications and obtain licensing income for his newer discoveries.

<strong><u>COUNT I – BREACH OF CONTRACT</u></strong><br>
<strong><em>Northwestern Medical Faculty Foundation d/b/a Northwestern Medical Group</em></strong>

46.    Plaintiff re-alleges and incorporates herein Paragraphs 1 - 45 above.

47.    Plaintiff's Contract is a valid, binding, and enforceable contract, supported by consideration.

48.    Plaintiff's Contract remains in full force and effect pursuant to ¶3 of the Contract which renews "from year to year without further action," and which cannot be changed or modified without a writing signed by the parties pursuant to its ¶9(b).    No changes or modifications have been agreed to and signed by both parties.

49.    All conditions precedent the Contract, if any, have been satisfied.

50.    As described in ¶32(c) above, Plaintiff's Contract is binding upon and inures to the benefit of both NMFF and Plaintiff, including "successors." (Emphasis added.)  In a March 4, 2013 letter to NMFF "colleagues," Neilson stated that in the proposed alignment between NMFF and NMHC "all of our faculty and staff employment agreements would…migrate intact to NMG."  Moreover, as described in ¶32(d) above, any change or modification to the Contract must be in writing and signed by the parties.

51.    At all relevant times, Plaintiff has performed and complied with each and every term of the Contract and has undertaken all reasonable efforts to resolve any Contract dispute or disagreements, or was ready, willing, and able to perform his obligations under the terms of the Contract.

52.    By unfortunate contrast, however, NMFF, in concert with its Co-Defendants, has undertaken and committed multiple, intentional, deliberate, and malicious violations of the

FILED DATE: 7/10/2020 4:45 PM    2019L007321

Contract, including specifically but not limited to violations of Schedule 1, ¶B.3 and ¶C.1. to the Contract, namely:

¶B.3.: (to) "Direct the Neuromuscular Disorders program having direct supervision of the Les Turner Foundation Lois Insolia ALS Clinic, the Les Turner Foundation ALS Research Program, and the Department's muscle histochemical laboratory;" (Emphasis added.) (Ex. B, Schedule 1, ¶B.3.)

¶C.1.: (to) "Serve administratively as our Departmental Director of Research programs. (Emphasis added.) (*Id*., ¶C.1.)

53.     The conduct undertaken by NMFF in concert with its Co-Defendants, as described in ¶¶43 (a)-(j) above, constitutes a flagrant, deliberate, and continuing breach of Schedule 1 provisions B.3 and C.1 of the Contract, in that they effectively removed, and continue to seek the removal of, Plaintiff from direct supervision of the Neuromuscular Disorders program with direct supervision of the Les Turner Lois Insolia ALS Clinic, the ALS Research Program, and the Department's muscle histochemical laboratory (¶B.3.), in addition to his effective removal as Departmental Director of Research programs (¶C.1.). In short, NMFF, in concert with its Co-Defendants, has cut Plaintiff's pay and opportunities for licensing income and, by funding cuts and interference with and redirection of his research funding, tried to set Plaintiff up for failure by making his job responsibilities virtually impossible to perform at the highest level.

54.     As a direct and proximate result of NMFF's material breach of the Contract, Plaintiff has suffered and will continue to suffer damages.

WHEREFORE, Plaintiff Teepu Siddique, M.D. respectfully requests this Honorable Court:

16

FILED DATE: 7/10/2020 4:45 PM   2019L007321

i.      Enter judgment in his favor and against Defendant Northwestern Medical Faculty Foundation d/b/a Northwestern Medical Group;

ii.     Award damages in an amount in excess of $30,000.00 to be determined at trial, together with prejudgment interest; and

iii.    Grant such further relief as this Honorable Court deems just and proper.

### COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT
#### *Dimitri Krainc, M.D.*

55.     Plaintiff re-alleges and incorporates herein Paragraphs 1-54 above.

56.     Plaintiff has, and at all times material herein had, a valid, binding, and enforceable contract with NMFF, supported by consideration.

57.     Plaintiff has performed and continues to satisfactorily perform all of his obligations under the Contract and had a reasonable basis to receive the benefits described therein.

58.     At all times material herein, Krainc, through actual or constructive knowledge, was aware or should have been aware of the Contract and its specific provisions.

59.     In spite of the foregoing, Krainc has deliberately, intentionally, and maliciously interfered and continues to interfere with the Contract by engaging alone, or in concert with Neilson, a pattern of conduct against Plaintiff as set out in ¶¶ 34-45 above.

60.     Krainc's wrongful conduct induced a breach of Plaintiff's Contract.

61.     Krainc's wrongful conduct was without legal justification and was not privileged because it induced a breach of Plaintiff's Contract that is solely for Krainc's gain, that is solely for the purpose of harming Plaintiff; and/or that is contrary to the interests of NMFF.

62.     Just one example of the foregoing unprivileged conduct by Krainc is the reputational damage inflicted on Plaintiff by Krainc when Krainc announced to the department faculty and staff in 2016 that Plaintiff had been "put out to pasture." There is no reasonable

17

FILED DATE: 7/10/2020 4:45 PM   2019L007321

much less benign interpretation of such a remark except that it was meant solely to harm Plaintiff and could not – under any scenario – be in the interest of NMFF.   (¶34.)

63.     Krainc has acted willfully and maliciously to interfere with Plaintiff's Contract.

64.     As a direct and proximate result of Krainc's wrongful conduct and the resulting breach of contract between Plaintiff and NMFF, Plaintiff has and will continue to suffer severe, immediate, and irreparable harm, damage, and injury.

WHEREFORE, Plaintiff Teepu Siddique, M.D. respectfully requests this Honorable Court:

i.      Enter judgment in his favor and against Dimitri Krainc, M.D.;

ii.     Award compensatory damages in excess of $30,000.00 in an amount to be determined at trial, together with prejudgment interest;

iii.    Award punitive damages in an amount in excess of $30,000 to be determined at trial; and

iv.     Grant such further relief as this Honorable Court deems just and proper.

### COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT
*Eric G. Neilson, M.D.*

65.     Plaintiff re-alleges and incorporates Paragraphs 1 – 64 above.

66.     Plaintiff has a valid, binding, and enforceable contract with NMFF, supported by consideration.

67.     Plaintiff has performed and continues to satisfactorily perform all of his obligations under the Contract and had a reasonable basis to receive the benefits described therein.

68.     At all times material herein, Neilson, through actual or constructive knowledge, was aware or should have been aware of Plaintiff's Contract and its specific provisions.

69. In spite of the foregoing, Neilson, either alone or in concert with Krainc, has deliberately, intentionally, and maliciously interfered and continues to interfere with the Contract as set out specifically in ¶¶ 34-45.

70. Neilson's wrongful conduct induced a breach of Plaintiff's Contract.

71. Neilson's wrongful conduct was without legal justification and was not privileged because it was induced a breach of Plaintiff's Contract that is solely for Neilson's gain, that is solely for the purpose of harming Plaintiff; and/or that is contrary to the interests of NMFF.

72. Neilson has acted willfully and maliciously to interfere with Plaintiff's Contract.

73. As a direct and proximate result of Neilson's wrongful conduct and the resulting breach of contract between Plaintiff and NMFF, Plaintiff has and will continue to suffer severe, immediate, and irreparable harm, damage, and injury.

WHEREFORE, Plaintiff Teepu Siddique, M.D. respectfully requests this Honorable Court:

i. Enter judgment in his favor and against Defendant Eric G. Neilson, M.D.;

ii. Award compensatory damages in an amount in excess of $30,000.00 to be determined at trial, together with prejudgment interest;

iii. Award punitive damages in an amount in excess of $30,000.00 to be determined at trial;

iv. Grant such further relief as this Honorable Court deems just and proper.

### COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT (in the alternative)
### *Northwestern University*

74. In the alternative, and solely in the event that the Court declines to order the relief requested in Counts II and III, Plaintiff brings this Count IV against NU.

75. Plaintiff re-alleges and incorporates Paragraphs 1-54 above.

19

76.     Plaintiff has, and at all times material herein had, a valid, binding, and enforceable contract with NMFF, supported by consideration.

77.     Plaintiff has performed and continues to satisfactorily perform all of his obligations under the Contract and had a reasonable basis to receive the benefits described therein.

78.     At all times material herein, NU, through actual or constructive knowledge, was aware or should have been aware of Plaintiff's Contract and its specific provisions.

79.     At all times relevant hereto, Krainc was an employee and/or agent, apparent or otherwise, of NU and was otherwise acting in the course of said employment and/or agency while engaging in the wrongful conduct set out specifically in ¶¶ 34-45.

80.     While Krainc was acting in the scope of his authority as an agent and/or employee, and/or holding himself out to be acting as an agent and/or employee of NU, he deliberately, intentionally, and maliciously interfered and continues to interfere with the Contract as set out specifically in ¶¶ 34-45.

81.     At all times relevant hereto, Neilson was an employee and/or agent, apparent or otherwise, of NU and was otherwise acting in the course of said employment and/or agency while engaging in the wrongful conduct set out specifically in ¶¶ 34-45.

82.     While Neilson was acting in the scope of his authority as agent and/or employee, and/or holding himself out to be acting as an agent and/or employee of NU, he deliberately, intentionally, and maliciously interfered and continues to interfere with the Contract as set out specifically in ¶¶ 34-45.

83.     Krainc and Neilson have acted willfully and maliciously to interfere with Plaintiff's Contract.

20

84.     The acts of NU, by and through the said wrongful conduct of its agents and/or employees Krainc and Neilson, induced a breach of Plaintiff's Contract.

85.     As a direct and proximate result of the wrongful conduct of NU's agents and/or employees and the resulting breach of contract between Plaintiff and NMFF, Plaintiff has and will continue to suffer severe, immediate, and irreparable harm, damage, and injury.

WHEREFORE, Plaintiff Teepu Siddique, M.D. respectfully requests this Honorable Court:

i.      Enter judgment in his favor and against Defendant Northwestern University;

ii.     Award compensatory damages in an amount in excess of $30,000.00 to be determined at trial, together with prejudgment interest;

iii.    Award punitive damages in an amount in excess of $30,000.00 to be determined at trial;

iv.     Grant such further relief as this Honorable Court deems just and proper.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT (in the alternative)
### *Northwestern Memorial Healthcare*

86.     In the alternative, and solely in the event that the Court declines to order the relief requested in Counts II and III, Plaintiff brings this Count V against NMHC.

87.     Plaintiff re-alleges and incorporates Paragraphs 1-54 above.

88.     Plaintiff has, and at all times material herein had, a valid, binding, and enforceable contract with NMFF, supported by consideration.

89.     Plaintiff has performed and continues to satisfactorily perform all of his obligations under the Contract and had a reasonable basis to receive the benefits described therein.

90.     At all times material herein, NMHC, through actual or constructive knowledge, was aware or should have been aware of Plaintiff's Contract and its specific provisions.

FILED DATE: 7/10/2020 4:45 PM    2019L007321

FILED DATE: 7/10/2020 4:45 PM    2019L007321

91.    At all times relevant hereto, Krainc was an employee and/or agent, apparent or otherwise, of NMHC and was otherwise acting in the course of said employment and/or agency while engaging in the wrongful conduct set out specifically in ¶¶34-45.

92.    While Krainc was acting in the scope of his authority as an agent and/or employee, and/or holding himself out to be acting as an agent and/or employee of NMHC, he deliberately and intentionally interfered and continues to interfere with the Contract as set out specifically in ¶¶ 34-45.

93.    At all times relevant hereto, Neilson was an employee and/or agent, apparent or otherwise, of NMHC and was otherwise acting in the course of said employment and/or agency while engaging in the wrongful conduct set out specifically in ¶¶ 34-45.

94.    While Neilson was acting in the scope of his authority as an agent and/or employee, and/or holding himself out to be acting as an agent and/or employee of NMHC, he deliberately and intentionally interfered and continues to interfere with the Contract as set out specifically in ¶¶ 34-45.

95.    Krainc and Neilson have acted willfully and maliciously to interfere with Plaintiff's Contract.

96.    The acts of NMHC, by and through the said wrongful conduct of its agents and/or employees Krainc and Neilson, induced a breach of Plaintiff's Contract.

97.    As a direct and proximate result of the wrongful conduct of NU's agents and the resulting breach of contract between Plaintiff and NMFF, Plaintiff has and will continue to suffer severe, immediate, and irreparable harm, damage, and injury.

WHEREFORE, Plaintiff Teepu Siddique, M.D. respectfully requests this Honorable Court:

i.      Enter judgment in his favor and against Defendant Northwestern Memorial Healthcare;

ii.     Award compensatory damages in an amount in excess of $30,000.00 to be determined at trial, together with prejudgment interest;

iii.    Award punitive damages in an amount in excess of $30,000 to be determined at trial;

iv.     Grant such further relief as this Honorable Court deems just and proper.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *Dimitri Krainc, M.D.*

98.     Plaintiff re-alleges and incorporates herein Paragraphs 1-73 above.

99.     Krainc's conduct towards Plaintiff as described herein (¶¶ 34-45), and his conduct continuing to the present, has been deliberate and intended to cause Plaintiff's emotional distress.

100.    Krainc's conduct, particularly the drastic and unnecessary cuts to his research funding and life's work, the berating and public humiliation of Plaintiff, and the demeaning of his scientific reputation has been extreme and outrageous.

101.    Krainc knew that the nature of his conduct, along with his status as a Chair of the NU Feinberg Department of Neurology with power over Plaintiff, would inflict severe emotional distress on Plaintiff or knew that there was a high probability that his conduct would do.

102.    Krainc's conduct as described above did in fact cause Plaintiff severe emotional distress, which manifested in Plaintiff's increased anxiety and stress, as well as cardiac issues and psychological injury for which he sought treatment from a healthcare provider.

WHEREFORE, Plaintiff Teepu Siddique, M.D. respectfully requests this Honorable Court:

i.      Enter judgment in his favor and against Defendant Dimitri Krainc, M.D.;

ii.     Award compensatory damages in an amount in excess of $3,000,000.00 to be determined at trial, together with prejudgment interest;

FILED DATE: 7/10/2020 4:45 PM    2019L007321

FILED DATE: 7/10/2020 4:45 PM   2019L007321

iii.     Grant such further relief as this Honorable Court deems just and proper.

**COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*Eric G. Neilson, M.D.*

103.    Plaintiff re-alleges and incorporates herein Paragraphs 1-73 above.

104.    Neilson's conduct towards Plaintiff as described herein (¶¶ 34-45), and his conduct continuing to the present, has been deliberate and intended to cause Plaintiff's emotional distress.

105.    Neilson's conduct, particularly the drastic and unnecessary cuts to Plaintiff's research funding and life's work, the berating and public humiliation of Plaintiff, and the demeaning of his scientific reputation has been extreme and outrageous.

106.    Neilson knew that the nature of his conduct, along with his status as the Chair of the Board of Directors for NMFF and the Vice President of Medical Affairs of NU and Dean of NU Feinberg with power over Plaintiff, would inflict severe emotional distress on Plaintiff or knew that there was a high probability that his conduct would do.

107.    Neilson's conduct as described above did in fact cause Plaintiff severe emotional distress, which manifested in Plaintiff's increased anxiety and stress, as well as cardiac issues and psychological injury for which he sought treatment from a healthcare provider..

WHEREFORE, Plaintiff Teepu Siddique, M.D. respectfully requests this Honorable Court:

i.      Enter judgment in his favor and against Defendant Eric Neilson, M.D.;

ii.     Award compensatory damages in an amount in excess of $3,000,000.00 to be determined at trial, together with prejudgment interest;

iii.    Grant such further relief as this Honorable Court deems just and proper.

24

FILED DATE: 7/10/2020 4:45 PM   2019L007321

Dated: July 10, 2020            Respectfully submitted,

                                         TEEPU SIDDIQUE, M.D.,
                                         Plaintiff,

                                By: */s/ M. Elysia Baker Analo*
                                   One of His Attorneys

Steven J. Rosenberg, Esq.
M. Elysia Baker Analo, Esq.
GOLAN CHRISTIE TAGLIA LLP
70 West Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300
sjrosenberg@gct.law
mebaker@gct.law
Firm ID 42399

FILED DATE: 7/10/2020 4:45 PM   2019L007321

FILED
7/10/2020 4:45 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L007321

9735641

# EXHIBIT A



# Northwestern University Medical School

FILED DATE: 7/10/2020 6:45 PM 2019L007321

Department of Neurology

Searle Family Center for Neurological Disorders
233 East Eric Street, Suite 614
Chicago, Illinois 60611
(312) 908-8266

August 9, 1990

Teepu Siddique, M.D.
Division of Neurology
Department of Medicine
Room 102; Research Park I
Box 2900
Duke University Medical Center
Durham, North Carolina 27710

Dear Teepu,

We are pleased that negotiations have progressed smoothly to this formal offer of a position at Northwestern University Medical School. We will recommend your faculty appointment at a rank of Associate Professor of Neurology (unmodified, with tenure) beginning September 1, 1990 or as soon as possible thereafter. This University appointment is contingent on the approval of the Appointment, Promotions & Tenure Committee and the Provost. We will also appoint you as the department's Director of Research with responsibilities for developing our research program and coordinating with the new Associate Dean for Research. Your clinical responsibilities would be primarily as an Attending Physician at Northwestern Memorial Hospital (NMH) and a member of Northwestern Medical Faculty Foundation (NMFF). This would initially include one half-day outpatient clinic per week. We are eager to maintain your general neurology skill by having you attending one month per year on the NMH/VA Neurology service.

You will be the Director of the Neuromuscular Disorders Program and have direct supervision of the Les Turner ALS Foundation relationships, the Lois Insolia ALS Clinic, and the muscle histochemical laboratory. Personnel involved with the program are Drs. Michael Minieka and Scott Heller, Shari Diamond, R.N., Jan Caliendo [histochemistry technician], Pat Heidkamp, RPT and, of course, your laboratory personnel. We utilize the Neurology out-patient clinic space for the Lois Insolia ALS Clinic [budget sent earlier]. The histochemistry laboratory is on Searle 11 at present. The Tarry 13 space is projected to be completed by July 1991 and the project has been basically on target. We have the initial architectural renditions and are reviewing these.

We can provide resources for your career development here, including a salary of $110,000 per year plus an additional $10,400 per year related to your duties as the department's Director of Research. The benefit package (approximately 30% of base salary; summarized in the materials sent to you earlier) includes medical, dental, life, malpractice and disability insurance; retirement contributions and a professional development fund of $2,000/year (for travel, journals, dues, etc.). In

FILED DATE: 7/10/2020 8:45 PM 2019L007321

the first year we will provide an additional $5,000 for travel between Duke and Northwestern to assist with the research transitions. Northwestern University assumes no guarantee for salary support for tenure in clinical departments.

We will provide space, initially in the Searle-11 area of about 850 ft$^2$ plus a shared major equipment room. I believe you saw this space. We will meet your long-term needs in the Tarry Building; this build-out will be completed in about one year. We would anticipate your help in planning the detailed layout of your permanent space on Tarry-13. Individual space modules are 120 ft$^2$ and combined spaces are therefore in multiples of 120. We would provide three 480 ft$^2$ laboratories and two 120 ft$^2$ offices for your individual research efforts. In addition, Core Resources would include a cryogenic facility of 240 ft$^2$ [including a cold room of 60 ft$^2$], a tissue culture area of about 840 ft$^2$ [of which about 400 ft$^2$ would be for genetics], and access to the multiuser equipment room [720 ft$^2$], video imaging/autoradiography facility [600 ft$^2$] and darkroom [120 ft$^2$].

We will provide equipment for the new Tarry space, including the tissue culture facility and your laboratories according to the lists exchanged earlier. The estimated cost of new equipment is about $270,000. We will also provide two tissue culture and one data entry technicians' salaries and $60,000/year for supplies for two years. We will also provide ongoing salary support for a secretary for the genetics program. The Les Turner ALS Foundation is also contributing to the start up funds and, after two year, will make every effort to sustain its increased contribution to research of $120,000/year. After the start up period, these Les Turner Foundation research funds can be used for the laboratory support according to the budgets you negotiate with the Foundation. Some salary support for you could be provided in the clinical program support from the Foundation; currently this funding totals $110,000 and includes $25,000 of faculty salary [for Drs. Heller and Minieka]. In addition, the Harold Post Endowment funds will provide about $15,000/year when the endowment is fully funded in about 2 years. We will also utilize the Schaff endowment [about $20,000/year] to support the start up expenses and subsequently contribute to your salary base. Thus, your salary will have support of at least $35,000 from University endowments and additional sums from the ALS Les Turner clinical program grant.

We will reimburse you for expenses for the physical moving of your personal and professional property from Durham to Chicago. Northwestern University requires two estimates for reimbursement of moving expenses. We can also pay for an additional house hunting trip; presumably Nailah can use this also for job hunting.

We hope these commitments will permit the ALS program to flourish. We all hope the resources will also stimulate the development of neurogenetics in general and that components of other programs [Alzheimer; Parkinsonism, etc.] can also develop with some supplementation of these resources. As you know, Northwestern has identified both Genetics and Neuroscience as fields for development as "Areas of Excellence".

There should be little problem with your appointment to the Northwestern University Institute for Neurosciences based on our experience with other Neurology faculty and the Institute's keen interest in developing a genetics component. This appointment will place you in a position to work with the graduate programs; there is one Ph.D. candidate currently working in the department.

I am also taking the liberty of including application forms necessary for faculty appointment, NMH Staff privileges, IRB review and your Illinois Medical license. I would encourage you to submit these, particularly the license materials, as soon as possible to avoid delays.

We hope this offer will meet your expectations and that we can have a positive decision from you soon. On a personal level, let me offer my great interest in attracting you as a colleague. I believe your personal qualities and strong academic instincts will enrich our department a great deal. Please call upon me if I can clarify any issues.

Sincerely yours,

David A. Stumpf, M.D., Ph.D.
Professor and Chairman of Neurology
Professor of Pediatrics

FILED DATE: 7/10/2020 6:55 PM    2019L007321

FILED
7/10/2020 4:45 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L007321

9735641

# EXHIBIT B

FILED DATE: 7/10/2020 4:45 PM   2019L007321

# NORTHWESTERN MEDICAL FACULTY FOUNDATION

ADMINISTRATION OFFICE
666 North Lake Shore Drive•Suite 132
Chicago, Illinois 60611
(312) 908-8391

Member's Name: ___TEEPU SIDDIQUE, M.D.___

Department of: ___MEDICAL NEUROLOGY___

Effective Date: ___1/1/91___

Dear ___Dr. Siddique___ :

We welcome you into the "Northwestern Medical Faculty
Foundation" (herinafter referred to as the "Foundation", an
Illinois not-for-profit corporation, under the following
terms and conditions:

1. You are associated and employed in accordance with
this Letter Agreement. Your duties, which will include
teaching, research, and clinical practice, as mutually
agreed, are enumerated in Schedule 1, which is attached
hereto, and made a part hereto, and made a part hereof by
this reference.

2. The Foundation will compensate you for your services
at an annual salary together with certain fringe benefits as
more fully enumerated in Schedules 2 and 3; which are
attached hereto and made a part hereof by this reference.

3. (a) The term of the employment under this agreement
shall begin on ___1/1/91___ and shall be conditional upon your
maintaining a faculty appointment with Northwestern
University Medical School (hereinafter NUMS) in good standing
at all times, in accordance with the terms of the By-Laws of
the Foundation. This Agreement shall be renewed from year to
year without further action, unless terminated by you or the
Foundation as more fully set out hereinafter in accordance
with the terms of this Agreement and the By-Laws of the
Foundation.

(b) This Agreement confers no right of tenure.
Academic tenure at Northwestern University Medical School is
governed by the rules and regulations of Northwestern

1

University, as outlined in the faculty handbook (July, 1981), and is solely the province of Northwestern University, and does not encumber the Foundation.

4.    (a)    You agree not to engage, during the period of this Agreement, in the private practice of health care except in keeping with the policies of the Foundation. As a condition of this employment, you hereby waive any and all right to direct compensation from any patient for health care services rendered during the period of this Agreement, regardless of the nature of that service, and assign all such compensation and rights to compensation to the Foundation and you further agree that the Foundation has the right to endorse your name on any checks for patient care to make said checks payable to the Foundation.

(b)    You further agree that you will waive any right, pursuant to the By-Laws of the Foundation and this Agreement, in and to any funds of any kind, nature or description due you or the Foundation as a result of your health care services during the period of said employment by the Foundation, including by description but not by limitation fees billed directly by you, by the Foundation, or by any third party billing in your name. Further, you agree that you have no vested rights in any funds, gifts, grants, or contributions made to said Foundation by any patient, third party or entity, even though such are made in your name.

(c)    This Agreement is not assignable by either party. Modifications and amendments to this Agreement must be agreed to in writing by the parties. This Agreement shall be governed by, and interpreted under, the laws of the State of Illinois.

5.    Should you permanently cease to be a member of the Foundation, it is agreed that the Foundation shall pay you as severance pay all your accrued wages, to date of termination of services. You shall give notice to the Foundation of your intention to terminate this employment 30 days before the effective date, and the Foundation shall give notice to you 30 days before the effective date should it desire to terminate this employment as provided in paragraph 10 hereof.

6.    Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing via Certified Mail, return receipt requested, which shall be addressed, in the case of the Foundation to its registered office in the State of Illinois and in your case, to your last known place of residence, as reflected in the Foundation's records.

7.    This Agreement shall be binding upon and inure to

2

the benefit of the Foundation and you, and their respective heirs, legal representatives, executors, administrators, successors, and assigns.

8. If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable and carried into effect, unless to do so would clearly violate the present legal and valid intentions of the parties hereto.

9. (a) This Agreement constitutes the entire agreement between the parties and contains all of the agreements between the parties with respect to the subject matter hereof; this Agreement supersedes any and all other agreements, either oral or in writing between the parties hereto with respect to the subject matter hereof.

(b) No change or modification of this Agreement shall be valid unless the same be in writing and signed by you and the Foundation. No waiver of any provisions of this Agreement shall be valid unless in writing and signed by the party or person to be charged.

10. During the tenure of this agreement, upon recommendation by the Chairman of your Department and Approval of the Board of Directors, you may be terminated upon written notice, for any activity which impairs your ability to perform your professional and medical services to the Foundation, or causes disrepute or dereliction of the professional relationship either to the Foundation or to you, including by description but not limitation, the following:

| | |
|---|---|
| Drug addiction | Alcoholism |
| Gross medical negligence | Felony conviction |
| Moral turpitude | Loss of medical license |

11. In the event you are terminated by the Foundation, this will not affect in any regard your continuance of employment and association as a faculty member with Northwestern University Medical School. In the event of severance from Northwestern University Medical School, pursuant to the By-Laws of the Foundation, this contract with the Foundation must be terminated at the next regularly called Director's Meeting. In the event of said termination of employment or association by the Foundation, you shall be entitled to a hearing if written notice of said hearing request is received by the President of the Foundation not later than 30 days after the notice of termination is mailed to you. In the event a notice of election to appeal is not received by the President of the Foundation within 30 days of termination, the right to appeal shall terminate. Said hearing is to be called within 90 days to be heard by a panel

3

of 3 members of the Foundation, consisting of the designee of
the Dean of Northwestern University Medical School, a faculty
member selected by you, and a third member acceptable to both
designees.    The decision of two-thirds of the members of the
committee   shall be controlling.    This committee shall   hold
hearings   with   dispatch to dispose of the   matter   within   6
months   after   being   impaneled,   via written report   to   the
President and Board of Directors of the Foundation.

12.    The use of the masculine, feminine or neuter gender
and the use of the singular or plural shall not be given   the
effect   of any exclusion or limitation herein,   but shall   be
used interchangeably as the text shall direct.


If   you   agree   to   the terms   and   conditions   of   this
Agreement, please execute both copies, and return both to the
Foundation. One copy will be returned to you for your records
after all signatures have been obtained.

Respectfully,

NORTHWESTRN MEDICAL FACULTY
FOUNDATION, INC.


Harry N. Beaty, M.D.,
PRESIDENT


Department Chairman
DAVID A. STUMPF, M.D.

ACCEPTED AND AGREED

to this _____ day of _____, 19____.


Member's Signature

TEEPU SIDDIQUE, M.D.
(Please Print Member's Name)


Attachments:   Schedules 1, 2, & 3

4

NORTHWESTERN MEDICAL FACULTY FOUNDATION, INC.

## SCHEDULE 1

Description of Member's Duties and Responsibilities:

The following outline will detail your responsibilities to the department under the agreement with Northwestern Medical Faculty Foundation, Inc. (NMFF)

A.  Teaching Assignments:

1.  Teach neurology in accordance with departmental policies to medical students, post-doctoral trainees and ancillary medical personnel.

B.  Clinical Assignments:

1.  Provide care and assume clinical responsibilities for patients at Northwestern Memorial Hospital and other McGaw Medical Center Hospitals on a fee for service basis as defined by the policy of the Department of Neurology.

2.  Instruct and supervise care of patients rendered by post-doctoral trainees and/or medical students in the inpatient neurology unit and neurology consultation service.  Patient records, diagnosis, management and treatment plans of NMFF patient's evaluated by post-doctoral trainees and/or medical students will be approved by personal signature.

3.  Direct the Neuromuscular Disorders program having direct supervision of the Les Turner Foundation Lois Insolia ALS Clinic, the Les Turner Foundation ALS Research Program, and the Department's muscle histochemical laboratory.

4.  Manage the care of general neurology patients for at least one half-day outpatient clinic per week.

5.  Manage the Department's NMH/VA inpatient attending service by attending at least one month per year.

C.  Other Assignments:

1.  Serve administratively as our Departmental Director of Research programs.

2.  Participate in the clinical research conducted by members of the Department of Neurology.