### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NEURODEGENERATIVE DISEASE RESEARCH, INC., | |
| Plaintiff, | Case No. 25-CV-02775 |
| v. | Judge Mary M. Rowland |
| NORTHWESTERN UNIVERSITY, | |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Neurodegenerative Disease Research, Inc. ("NDR") has sued Northwestern University ("Northwestern"), bringing counts for fraudulent concealment, breach of contract, and equitable accounting. Before the Court now is Northwestern's motion to dismiss [21] the amended complaint [17]. For the reasons stated herein, Northwestern's motion to dismiss [21] is granted in part and denied in part.

### I. Background

The following factual allegations taken from the operative complaint [17] are accepted as true for the purposes of the motion to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

NDR is a 501(c)(3) nonprofit organization headquartered in Florida. [17] ¶ 1. Dr. Ellison, the president of NDR, founded the organization in March 2020 with the purpose of funding research into amyotrophic lateral sclerosis ("ALS"). [17] ¶¶ 5-11. Dr. Ellison founded NDR after her friend Richard was diagnosed with ALS; Richard

1

had substantial monetary resources and directed NDR to use those resources to fund ALS research. *See* [17] ¶¶ 8-9.

While searching for potential scientists to donate to, Dr. Ellison became aware of Dr. Siddique, a physician-scientist and neurogeneticist internationally recognized as a preeminent expert in the study of ALS. [17] ¶¶ 12-13. At the time, Dr. Siddique was employed by Northwestern's Feinberg School of Medicine ("Feinberg") and had worked for Northwestern since 1991. [17] ¶ 14. Over the next several months, Dr. Ellison and Dr. Siddique discussed various avenues for ALS research, and Dr. Ellison concluded that Dr. Siddique's proposed research was promising. [17] ¶¶ 15-17. Around January 2021, Dr. Ellison met with Andrew Christopherson, an assistant dean at Feinberg, who praised Dr. Siddique and emphasized the valuable research that Dr. Siddique's laboratory produced at Northwestern. [17] ¶ 19.

Around this time, Dr. Siddique recommended that NDR make a gift to Northwestern to be designated for funding the ALS research that Dr. Siddique was conducting, and NDR agreed. [17] ¶ 20. Based on her conversations with Dr. Siddique and Mr. Christopherson, Dr. Ellison was under the impression that Dr. Siddique would direct the projects funded by NDR. [17] ¶ 22.

On April 6, 2021, NDR and Northwestern executed their first gift agreement (the "First Agreement"). [17] ¶ 23. The purpose of the First Agreement was for NDR to provide Dr. Siddique and Northwestern with funding to carry out two different ALS research projects. [17] ¶ 23. As a part of the agreement, NDR agreed to donate $1,610,000, and Northwestern agreed to (among other things) prepare an annual

2

report about the use of donations until the donated funds were fully expended. [17] ¶¶ 25-27.

After executing the First Agreement, NDR and Dr. Siddique discussed a larger additional research project, which the parties came to call the "Big Project." [17] ¶ 28. Dr. Ellison and Dr. Siddique repeatedly discussed the Big Project as a long-term, five-year enterprise. [17] ¶ 30. NDR (and its funder, Richard) communicated to Dr. Siddique that they wanted to fund the Big Project, but that they wanted to do so through incremental, annual donations rather than a lump-sum at the onset. [17] ¶¶ 31-36. The parties ultimate signed a second gift agreement (the "Second Agreement"), which provided that NDR would donate $12.5 million to Northwestern via semiannual payments of $1.25 million over five years. [17] ¶ 44. Like the First Agreement, the Second Agreement also required Northwestern to prepare an annual report about the use of the donation. [17] ¶ 46.

During the negotiations leading up to the Second Agreement, both Northwestern and Dr. Siddique represented that Dr. Siddique and/or his laboratory at Northwestern would be conducting the research funded by the Second Agreement. *See* [17] ¶¶ 38 – 41. A draft version of the Second Agreement proposed by Northwestern included language that the donations would be used to "study [ALS] in the laboratory of Dr. Teepu Siddique, or its successor." [17] ¶ 41. NDR required that the final text be changed to read that donations would "be used to study [ALS] in the laboratory of Dr. Teepu Siddique and under his direction." [17] ¶ 41.

Near the end of 2022, however, Dr. Siddique revealed to NDR that he was leaving Northwestern, and his position with the university was terminated as of February 1, 2023. [17] ¶¶ 61-62. NDR subsequently learned that Dr. Siddique's and Northwestern's relationship had been strained since at least as early as 2019, when Dr. Siddique filed a lawsuit (the "Siddique Action") against Northwestern. [17] ¶¶ 54-55.

In the Siddique Action, Dr. Siddique alleged, among other things, that Northwestern leadership announced to Feinberg faculty and staff that Dr. Siddique had been "put out to pasture," that Northwestern leadership was actively looking to replace Dr. Siddique, and that Northwestern leadership was attempting to force Dr. Siddique out of his role. [17] ¶¶ 56-67. Dr. Siddique and Northwestern entered into a settlement agreement in the Siddique Action in February 2022. [17] ¶ 61.

Ultimately, NDR alleges that through both the First and Second Agreements, NDR made payments to Northwestern totaling $3.36 million. [17] ¶ 63. NDR further alleges that Northwestern never provided an annual report as both agreements required, and NDR does not know how its donations were spent. [17] ¶ 65. Further, NDR alleges that no material progress on ALS research resulted from NDR's donation, and Dr. Siddique's departure from Northwestern effectively doomed the Big Project. [17] ¶ 67.

## II. Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and

raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## III. Analysis

### A. Count I - Fraudulent Concealment

In Count I, NDR alleges that Northwestern fraudulently concealed that it had a "serious dispute" with Dr. Siddique. To state a claim for fraudulent concealment under Illinois law[1], a plaintiff must plead "(1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury." *McAuliffe v. MicroPort Orthopedics, Inc.*, No. 20 C 7322, 2021 WL 3930365, at *3 (N.D. Ill. Sept. 2, 2021); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012); *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 864 (N.D. Ill. 2022).

Northwestern argues that NDR's claim fails because (1) Northwestern did not have a duty to disclose its dispute with Dr. Siddique, (2) the existence of the dispute was not a material fact, (3) Northwestern's failure to disclose the existence of the dispute was not intended to induce a false belief, and (4) NDR could have learned of the dispute on its own. The Court addresses each argument in turn.

### i. Duty to Disclose.

In Illinois law, a duty to disclose arises where there is a "special or fiduciary relationship" between the parties. *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp.

---

[1] Neither party contests that Illinois law applies to this action.

3d at 863. "A fiduciary relationship automatically arises from particular relationships, such as attorney-client and principal-agent, as a matter of law[, or it] may also arise from the special circumstances of the parties' relationship, such as when one party justifiably places trust in another so that the latter gains superiority and influence over the former." *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1362 (Fed. Cir. 2001) (citing *Ransom v. A.B. Dick Co.*, 753, 682 N.E.2d 314, 321 (Ill. App. Ct. 1997)).

Here, the parties' dealings with one another are sufficient to establish that there existed a special relationship giving rise to a duty to disclose. To briefly recount the facts: Richard was diagnosed with ALS; Richard agreed to work with NDR to try to identify the most promising ALS researcher in the world; NDR determined that that individual was Dr. Siddique; NDR, Northwestern, and Dr. Siddique engaged in months-long negotiations to fund a five-year research project at Northwestern directed by Dr. Siddique; during those negotiations, NDR specifically changed the language in the Second Agreement to remove the possibility that the research would be conducted by someone *other* than Dr. Siddique; just two years into the research project, Dr. Siddique left Northwestern—dooming the research project—allegedly as a result of litigation between Dr. Siddique and Northwestern that began two years *before* NDR and Northwestern executed the Second Agreement. Northwestern knew that NDR planned to give Northwestern a $12.5 million donation *solely for the purposes* of funding research conducted by Dr. Siddique. *See* [17] ¶ 41. NDR justifiably trusted that Northwestern would use NDR's donation to fund research

conducted by Dr. Siddique, and Northwestern had reason to know that Dr. Siddique might be unable to conduct that research. Taking the facts alleged as true, Northwestern had a duty to disclose the existence of litigation which might make it impossible for Dr. Siddique to conduct the research project.

Northwestern relies heavily on *Pearson*, where this court considered whether a non-profit donee owed a fiduciary duty to a potential donor in an arms-length transaction. *Pearson v. Garrett-Evangelical Theological Seminary, Inc.*, 790 F. Supp. 2d 759, 768 (N.D. Ill. 2011). The *Pearson* court is unpersuasive here because that court held only that the plaintiff there did "not allege any such duty" was owed; *Pearson* did not hold that no duty could *ever* exist in an arms-length transaction between a donee and donor, as Northwestern seems to suggest. *Id.* Here, NDR has pled non-conclusory facts showing that such a relationship existed. Accordingly, NDR has alleged that Northwestern had a duty to disclose.

### ii. Materiality

To state a claim for fraudulent concealment, the allegedly concealed fact must be "material." *Wigod,* 673 F.3d at 571. "A material fact exists where a [party] would have acted differently knowing the information, or if it concerned the type of information upon which a [party] would be expected to rely in making a decision whether to [contract.]" *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996).

Northwestern argues that the existence of the Siddique Action was immaterial because it was not reasonably foreseeable at the time the parties entered into the Second Agreement that the litigation would lead to Dr. Siddique's departure. That

8

may be true, but it misses the point. The question is not whether Northwestern should have known what the outcome of the Siddique Action would be; the question is whether NDR would have acted differently if it knew about the Siddique Action. NDR alleges that it conducted extensive research into which doctor and laboratory it wished to donate its funds to. NDR further alleges that it decided to donate to Northwestern because Dr. Siddique's laboratory was there and that NDR would not have otherwise donated to Northwestern. At the pleadings stage, NDR has sufficiently alleged the concealment of a material fact.

Northwestern also argues that NDR has failed to plead a material fact because a concealed fact is only actionable if it is a present or existing fact, rather than a projection of future events. [22] at 9-10. Northwestern again relies on *Pearson*. There, the plaintiff-donee donated a gift to a seminary to establish a scholarship for young students interested in pastoral work. 790 F. Supp. 2d at 762. The plaintiff alleged that the scholarship ultimately failed because the seminary was unable to attract promising students, a fact which it allegedly concealed from the plaintiff when the parties were negotiating the donation. *Id.* at 768. The court held that the plaintiff failed to state a fraudulent concealment claim because the concealed fact was a projection of the future rather than a fact existing at the time of the negotiations. *Id.*

The problem for Northwestern is that, unlike the claim in *Pearson*, NDR's claim *does not depend* on any projection of future events. Again, the allegedly concealed fact is *not* that Northwestern knew with any degree of certainty that Dr. Siddique would leave Northwestern; it is the existence of the Siddique Action itself. Northwestern's

*ex ante* assessment of how that litigation might unfold is irrelevant to the question before the Court now, which is whether NDR would have changed its behavior if it knew of the litigation. Because NDR has alleged facts demonstrating it would have acted differently if it knew about the Siddique Action, NDR has alleged the concealment of a material fact.

### iii. Reasonable Inquiry

"For . . . concealment to be fraudulent, it must not be discoverable through a reasonable inquiry." *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1026 (7th Cir. 2021). ". . . Illinois law imposes upon the plaintiff a duty to investigate when all the circumstances, evaluated in their totality, reasonable require, as a matter of prudence, that an investigation be undertaken." *Teamsters Loc. 282 Pension Tr. Fund v. Angelos*, 839 F.2d 366, 371 (7th Cir. 1988). "In short, the crucial question is whether the plaintiff's conduct was so unreasonable under the circumstances and 'in light of the information open to him, that the law may properly say that this loss is his own responsibility.'" *Id.* (citing *Chicago Title & Trust Co.*, 454 N.E.2d at 729).

Northwestern argues that because the Siddique Action was publicly docketed and at least two news articles were written about the lawsuit, NDR could have discovered the dispute through a reasonable inquiry. NDR does not contest that the lawsuit was a matter of public record and that NDR could have discovered it if it had inquired. The question is whether as NDR was *required* to look for the lawsuit (or indeed for other information suggesting that Dr. Siddique's employment at Northwestern may be in jeopardy).

10

As discussed above, NDR negotiated with Northwestern for the explicit purpose of funding research to be conducted by Dr. Siddique. NDR rejected a proposed contract term that contemplated that someone other than Dr. Siddique might conduct that research. NDR met repeatedly with Dr. Siddique and representatives from Northwestern, and nobody ever gave NDR the impression that their relationship was imperiled by the Siddique Action. The Court cannot say that under such circumstances the law imposed a duty on NDR to research whether Dr. Siddique and Northwestern were involved in litigation. At the pleadings stage, NDR has demonstrated that it would take something beyond a reasonable inquiry to have discovered the existence of the Siddique Action.

### i. Inducement of a False Belief

Northwestern also argues that NDR's claim should fail because NDR fails to allege that Northwestern concealed the Siddique Action with the intent to induce a false belief.[2] The Court does not agree. NDR alleged that Northwestern knew of the importance of Dr. Siddique leading the research and intentionally withheld telling NDR about the Siddique Action because Northwestern knew that such knowledge would jeopardize the gift NDR was planning to donate. [17] ¶ 59. Discovery may reveal some other more plausible inference. But NDR has met its burden at the pleading stage.

---

[2] Northwestern argues that NDR failed to respond to this argument in its opposition to the motion to dismiss and that any opposition is thus waived. [25] at 9-10. But NDR *did* respond to the argument (albeit with exceeding brevity, *see* [24] at 11), and in any event Northwestern's memorandum in support of its motion to dismiss expended only two sentences talking about this element in the first place. [22] at 8, 10. The Court thus declines to consider the point waived.

Accordingly, Northwestern's motion to dismiss Count I is denied.

## B. Count II - Breach of Contract

NDR has also sued Northwestern for breaching the First and Second Agreements. [17] ¶¶ 80-84. NDR's contract claim does not involve the Siddique Action at all—rather, NDR alleges that under both Agreements, Northwestern was obligated to (and failed to) provide NDR with annual reports demonstrating how its funds were used.

In its opening brief, Northwestern argues that NDR's contract claim fails because NDR failed to allege that it suffered damages. [22] at 11-12. NDR replied that it is only seeking specific performance—that is, for Northwestern to provide the annual reports—and that damages are thus not required to state a claim. [25] at 13 (citing *Lobo IV, LLC v. V Land Chicago Canal, LLC*, 138 N.E.3d 824, 846 (Ill. App. Ct. 2019). In its reply, Northwestern argues that "specific performance is a remedy, not a cause of action," and that NDR thus still needs to succeed on its breach of contract claim to obtain an award of specific damages. [25] at 13 (citing *LaSalle Nat'l Bank v. Metropolitan Life Ins. Co.*, 18 F.3d 1371, 1376 (7th Cir. 1994)).

Despite appearing a simple question, whether specific performance is a separate cause of action in Illinois—and thus whether NDR can state a claim without pleading damages—does not have an immediately clear answer. Some federal courts applying Illinois law, including the Seventh Circuit, have stated that specific performance is not a cause of action in Illinois law. *See, e.g., LaSalle*, 18 F.3d at 1376; *Lagen v. United Cont'l Holdings, Inc.*, 920 F. Supp. 2d 912, 919 (N.D. Ill. 2013). Other courts have

12

implicitly held otherwise. *See, e.g.*, *Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 960 (N.D. Ill. 2010) (describing elements required "[t]o state a cause of action for specific performance in Illinois"); *Lobo IV*, 138 N.E.3d at 846 (same); *Schilling v. Stahl*, 918 N.E.2d 1077, 1080 (Ill. App. Ct. 2009) (same).

Ultimately, the Court need not resolve this issue because NDR has failed to state a claim either way. To the extent that specific performance is *not* a separate cause of action and is only a remedy available in an action for breach of contract, NDR's claim fails because NDR concedes that it has not alleged that it suffered any damages. To the extent that specific performance *is* a separate cause of action, NDR's claim fails because NDR's complaint does not plead a cause of action for specific performance. Count II is plainly a claim for breach of contract, and in it, NDR requests other forms of relief aside from specific performance. [17] ¶ 84. A plaintiff cannot amend its complaint through briefing. *See Pirelli Armstrong Tire Corp. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011). If NDR wanted to bring a claim for specific performance, it must have included one in its complaint to provide Northwestern an opportunity to fully brief that issue.

Count II is thus dismissed without prejudice.

### C. Count III – Equitable Accounting

In Count III, NDR brings a claim for equitable accounting in the alternative to its breach of contract claim and seeks a "determination of how NDR's donations to Northwestern were used." [17] ¶ 90. To state a claim for equitable accounting under Illinois law, a plaintiff must allege that they have no adequate remedy at law and one

of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature. *Mann v. Kemper Fin. Cos., Inc.*, 247 Ill. App. 3d 966, 980 (1st Dist. 1992).

Northwestern argues that NDR has an adequate remedy at law and that NDR has failed to allege facts sufficient to satisfy any of the other requirements for an equitable accounting claim. The Court does not agree.

As discussed above, Northwestern argued in the context of NDR's breach of contract claim that the claim must fail precisely because NDR could not show it suffered monetary damages. NDR conceded that same point in its response brief. The Court is satisfied that NDR does not have an adequate remedy at law for Northwestern's alleged failure to provide annual reports describing how its funds were used. And for the reasons discussed above, NDR has alleged facts supporting an inference that a fiduciary relationship existed between the parties. NDR has thus stated a claim for equitable accounting.

## IV.   Conclusion

For the stated reasons, Northwestern's Motion to Dismiss [21] is granted in part and dismissed in part. Count II is dismissed without prejudice; Counts I and III survive dismissal.

E N T E R:

Dated: November 13, 2025

_____
MARY M. ROWLAND
United States District Judge